J. W. St. Clair v. The State.

No. 3447. Decided March 14, 1906.

**1.—Murder in the Second Degree—Evidence—General Reputation—Act of Third Parties.**

Upon trial for murder, after the witness for the defendant had testified to the general reputation of the deceased as being a quarrelsome man and that of defendant as being a reasonable citizen, it was error to permit the State on cross-examination to show that the witness and deceased had a quarrel in which the son-in-law of witness was also involved, and to go into details of said quarrel.

**2.—Same—Cross-Examination—Impeaching Testimony.**

Upon trial for murder, where the defense had laid a predicate to impeach a State's witness to the effect that he kept on piling cotton stalks and burning them while the shooting was going on, whereas on the trial he denied this statement, it was error to permit the State on cross-examination of the impeaching witness to bring out all the details in regard to the difficulty between deceased and defendant. Impeaching testimony must conform to the predicate laid and not go out into other matters.

**3.—Same—Reputation of Deceased—Bills of Exceptions—Harmless Errror.**

Upon a trial for murder, there was no error in the refusal of the court to permit defendant to prove the reputation of the deceased before the details of the killing, and that threats had been made by deceased against defendant were admitted in evidence; and especially where testimony of such threats appeared in the record of the case; and defendant's bill of exceptions did not show that after proving threats he again offered testimony as to the reputation of the deceased.

**4.—Same—Side-bar Remarks—Conduct of Attorneys.**

See opinion for remarks of the court with reference to side-bar remarks and animadversions and criticisms among the attorneys, which should be promptly restrained by the trial court.

**5.—Same—Charge of Court—Manslaughter—Self-Defense.**

Where upon trial for murder, there were adverse theories presented by the evidence, to wit: the issues of murder in the second degree, manslaughter and self-defense, and self-defense from the standpoint of fear of actual danger, as well as the standpoint of communicated threats, the court should have submitted special charges upon those theories.

**6.—Same—Abandonment of Difficulty—Self-Defense—Manslaughter.**

Upon trial for murder, it was not sufficient that the court charged that if deceased abandoned the difficulty and defendant so understood it, and he then fired upon and killed deceased he could not plead justification; for if appellant was acting on the defensive, he might in that case not be guilty of a higher offense than manslaughter, and the court under the evidence in the case should have so charged the jury.

**7.—Same—Defensive Theory—Vantage Ground.**

Where upon trial for murder the defensive theory was that there was no abandonment of the difficulty by the deceased, and there was evidence that the deceased during the difficulty approached a tree for the purpose of getting a better vantage ground, and that the acts of the defendant and deceased and the features of the difficulty moved in rapid succession, and involved self-defense, manslaughter and abandonment of the difficulty, the court should have charged specifically on those issues.

**8.—Same—Dangerous Character of Deceased—Self-Defense.**

Evidence in regard to the dangerous character of the deceased is admissible as evidence in the case to be weighed by the jury; but the slayer would have as much right to act in self-defense if his life was in danger, either actually or apparently, whether deceased was or was not a dangerous man, and the right of self-defense is not curtailed by reason of the fact that the deceased was not known as a dangerous man. See opinion for charge of court on this phase of the case which was held too restrictive.

**9.—Same—Transcript—Stenographic Report—Narrative Statement.**

See opinion for suggestion of the court that the narrative form of perpetuating the evidence for appeal, is preferable to long stenographic reports of the testimony during the trial.

Appeal from the District Court of Collin. Tried below before Hon. J. M. Pearson.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The testimony disclosed that bad feeling existed between the defendant and deceased for some time prior to the homicide, and that the deceased had made threats against the defendant which were communicated to the latter; that on the evening of the day of the difficulty the parties met on the road, and that deceased said to the defendant: "God damn you, if I knew you had been at my place I would kill you," and then grabbed at the gun which defendant carried in his buggy; that the horse of defendant became frightened and defendant jumped or fell out of the buggy, when the shooting began. The State's witnesses testified that the defendant shot at the deceased who started to run, the defendant pursuing him and firing at him; that when deceased had run a piece, he threw up his hands and begged defendant

not to shoot him any more; that this was before the defendant fired the second shot at deceased, and that defendant fired a third shot at deceased, when the latter turned around and started to run and grab a tree and fell; that then defendant turned and walked back. The defendant's testimony was, with reference to the difficulty, that deceased threw up a stick when they met and told defendant to hold up; that defendant stopped his horse and buggy; and then the conversation between the two occurred pretty much as the State's witnesses gave it; that then the deceased tried to jerk the gun away from defendant, and defendant's horse jumped forward, and that he went over the buggy striking against the wire fence and turning over on his breast; that defendant then raised up and began shooting at deceased, who had a pistol drawn; that deceased shot at defendant after defendant's first shot; that the defendant shot at him again and deceased returned the fire, coming forward at defendant with his pistol in his hand working at it; that by that time the defendant had reloaded his gun and again shot at deceased, who then wheeled and run; and defendant didn't shoot him any more.

A pistol was found on the ground, and there was some testimony as to a tree or trees where the difficulty had occurred, and that deceased was found lying near one of them. The testimony is very voluminous, but the above statement together with that contained in the opinion is sufficient to an understanding of the assignments of error and the ruling of the court thereon.

*Abernathy & Mangum, Abernathy & Abernathy,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction was for murder in the second degree, with seven years confinement in the penitentiary allotted as the punishment.

Langham testified to the general reputation of the deceased as being a quarrelsome man, and that of defendant as being a reasonably peaceful citizen. The State, on cross-examination, then asked witness if he had ever heard of deceased having a quarrel with any one. Witness answered that deceased and he had had such quarrel. Over objection of appellant the details of the trouble between the witness and deceased was gone into before the jury; and that quarrel also involved the son-in-law of Langham, Milford. Milford was also placed on the stand by the State and permitted to go at great length into the details, reasons, and whys and wherefores of the quarrel between Langham and himself on one side, with the deceased on the other. Objections were urged to the introduction of this testimony, which ought to have been sustained.

Felix Howard was a witness for the State. On cross-examination he testified that he was burning stalks and had burned three piles of stalks during the fight. He was then asked how many piles of stalks

he put up during the fight; and he answered that he never put up any. The predicate was then laid to impeach him by 'Squire Beckham, to the effect that he had stated to Beckham, that he had piled up a half-dozen armfuls while the shooting was going on. He denied this; and stated that he did not pile any stalks while the difficulty was in progress; and the defendant thereupon called Beckham, who testified that he heard Felix Howard state that he kept on piling stalks while the shooting was going on, and he thought he piled a half-dozen armfuls during its progress, and that he called the boy's attention to it, and he repeated the statement; that the statement was made on Sunday, after the shooting, in the back of the bank building at Blue Ridge. It was also stated, while this examination was in progress, that Abernathy, of counsel for the defense, had requested Beckham, justice of the peace, to be present so that no advantage would be taken of the boy, Felix Howard, when he made his statement to Abernathy. The State, upon cross-examination of Beckham, went into all of the details of the conversation with Howard, in regard to the difficulty between deceased and defendant, which covers several pages of the transcript, and about matters independent of and foreign to the impeaching evidence, and covering the entire difficulty betwen appellant and deceased. It is not necessary here to detail this; it is too voluminous. Suffice it to say that it covered largely the statement of the boy, Felix Howard, to Beckham and Abernathy in regard to the entire difficulty, resulting in the death of Cundiff. This testimony, as well as that in the previous bill of exceptions should not have gone to the jury. We deem it unnecessary to go into a discussion of the matters, as the authorities are numerous, to the effect that the impeaching testimony must conform to the predicate laid, and not go out into other matters. Red v. State, 39 Texas Crim. Rep., 424; Messer v. State, 43 Texas Crim. Rep., 97, 63 S. W. Rep., 644.

Bills of exception were reserved to the refusal of the court to permit appellant to prove the reputation of the deceased. The qualification of the court to these bills, states that this testimony was offered before the details of the killing were admitted in evidence, and before it was shown that threats had been made by deceased against appellant. As qualified by the court, we believe the exception was not well taken. The bills do not show that after proving the threat, the same testimony was again offered. The record, however, contains testimony fully showing the threats of deceased against appellant, and this testimony forms the basis of some of the charges given by the court.

There are some exceptions reserved to the conduct of the prosecution during the trial. As the case will be reversed on other grounds we pretermit a discussion of these bills. There seems to have been considerable wrangling and discussion along the line of side-bar remarks and animadversions and criticism among the attorneys. Such matters and conduct ought to be promptly restrained by the trial court. We fully appreciate the fact that attorneys in their earnestness in advocat-

ing their cause become heated, and often go beyond the case; but the court should promptly exercise authority. Such conduct is not conducive in the highest sense to the enforcement of the law, or in strict consonance with what should encompass the trial.

Several sections of the court's charge are criticised in regard to manslaughter and self-defense, and the failure to submit special charges in regard to those theories of the evidence. Without repeating the evidence and going into detail, we think some of the criticisms are just and correct. There were adverse theories presented by the evidence: the issues of murder in the second degree, manslaughter and self-defense, and self-defense from the standpoint of actual and apparent danger, as well as the standpoint of communicated threats. The issue of abandonment of the difficulty by deceased was also in the case, and charged upon by the court. This portion of the charge informed the jury that, if deceased abandoned the difficulty and appellant so understood it, he then fired upon and killed deceased, he could not plead justification. This is the substance of the charge on the abandonment of the difficulty. This is not sufficient. If appellant was acting on the defensive, and while engaged in the difficulty, deceased abandoned the difficulty, and appellant so understood it, and he then shot and killed deceased he would not be justified. But he might not be guilty of a higher offense than manslaughter. The court did not instruct the jury what would be the law applicable to appellant's case under this condition of things. In our opinion, if the jury should find that defendant was acting on the defensive, and the deceased abandoned the difficulty, and as he was leaving, if the jury should find he was, appellant then shot him, knowing or realizing that deceased had abandoned the difficulty, his offense would not be higher than manslaughter. As the charge is given it left the jury to ascertain for themselves of what offense appellant would be guilty if he shot after deceased abandoned the difficulty. They gave appellant murder in the second degree. If the law had been charged it might not have been higher than manslaughter.

There is another question in regard to this abandonment also that should have been charged more favorable to appellant. The defensive theory was that there was no abandonment, and there being evidence of the fact that deceased was approaching a tree, and that this was only for the purpose of getting a better vantage ground from which to carry on the battle. If the jury should believe this state of fact, then there would be no abandonment of the difficulty, and appellant's right of self-defense would be in no manner abridged. Of course, in a difficulty like the one detailed in this evidence, matters and occurrences move in rapid succession: and if there was an abandonment at all, or if deceased was approaching the tree for the purpose of getting a vantage ground, it must have been done in an almost incredible short space of time. The rapidity of the movements of the parties, and the shortness of a difficulty of this character, where self-defense, man-

slaughter and abandonment of the difficulty all congregate within a moment or two of time, would call on the court to be specifically certain with reference to the law when those issues are set forth in the charge.

We would call attention also to another phase of the charge on self-defense. The 24th subdivision of the charge, which pertains to self-defense is, as follows: "On the other hand, if you find and believe from the evidence, that prior to the killing, J. A. Cundiff had made threats to kill or inflict serious personal violence upon the defendant, J. W. St. Clair, and you further believe from the evidence that J. W. St. Clair before the killing, was informed of said threats, and was warned that Cundiff was a dangerous man; and you further believe from the evidence that on the occasion of the killing J. A. Cundiff used words or did acts, or used words and did acts which indicated a purpose and intention on the part of Cundiff to carry said threats into execution," etc. This charge is criticised because it coupled the right of self-defense with the fact that appellant was warned Cundiff was a dangerous man. In other words, that the law of self-defense was curtailed by the fact that deceased was a dangerous man. It is too restrictive, or rather it is a burden upon self-defense which the law does not justify. The statute authorizes the slayer to act in self-defense where threats have been communicated to the slayer; and the party slain at the time of the difficulty did some act manifesting his intention to execute the threat. It is not necessary that he be a dangerous man. It is true that the statute authorizes the introduction of evidence that deceased was a violent and dangerous man, but it does not make the right of self-defense depend upon that fact. It depends upon the fact that the deceased did some act manifesting his intention to execute the threat. The evidence in regard to the dangerous character of the deceased is admissible as evidence in the case to be weighed by the jury. The slayer would have as much right to act in self-defense if his life was in danger, either actually or apparently, whether deceased was or was not a dangerous man, and the right of self-defense is not curtailed by reason of the fact that deceased was not known as a dangerous man.

There are over forty questions presented for revision, including those discussed; many of them we deem unnecessary to be reviewed. Among other things stated in the motion for new trial is the misconduct of the jury, as well as the further fact that on several occasions separation occurred. The evidence in regard to this is voluminous, covering nearly one hundred pages. But in view of the disposition made of the case, these matters are not discussed. Nor is the further question in regard to the formation of the jury and the manner of selecting and summoning the special venire, as it will not occur upon another trial.

This record contains nearly eight hundred pages of rather closely typewritten matter; and it occurs to us that the salient features necessary for the disposition of it on this appeal, might have been easily placed within two hundred pages—at least in a much smaller compass than was done. It places upon this court a very great burden,

and an unnecessary one, to go through such tremendous records to review a few questions, when they could have been easily presented by being properly and judiciously stated. We make the suggestion that in preparing records for appeal to this court, they be made up entirely with the view of presenting concisely and succinctly, yet fully, the questions to be decided, omitting all unnecessary details. It is true that, under the recent act of the Legislature the right is given to send up the stenographic report, and perhaps in some instances this may be necessary, but such cases are or ought to be rare occurrences. The "narrative" form of perpetuating the evidence for appeals is the better practice, and is not in violation of the recent act of the Legislature, when attorneys and the court below see proper to do so. Of course, we would not undertake to criticise their action in this respect. But where this practice can be avoided, we suggest that it be done. The crowded condition of our docket renders it now almost impossible for this court to dispose of the rapidly increasing appeals. These suggestions are made in order that trial courts and attorneys may be of assistance in the rapid disposition of appeals, and without suggesting or intimating that any right, real or imaginary they may have, shall be curtailed.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*