MARION BRADLEY v. THE STATE.

No. 251. Decided November 30, 1910.

1.—Murder—Charge of Court—Threats—Requested Charge.

Where, upon trial of murder, the evidence raised the issue of self-defense, and threats by the deceased, and the court submitted both issues in a proper charge, there was no error in refusing defendant's requested charge on the issue of threats which trenched closely on being on the weight of the evidence and was somewhat argumentative.

**2.—Same—Evidence—Bill of Exceptions—Practice on Appeal.**

Upon trial of murder, where defendant's counsel on cross-examination of the widow of deceased brought out the fact that she did not hear her husband curse the defendant and tell him he would choke him, etc., some time before the homicide, and State's counsel asked the witness whether her husband ever cursed to which the witness replied she had never heard him swear; to which question of State's counsel defendant objected, but it did not appear by defendant's bill of exceptions that this testimony ever went to the jury, there was no error.

**3.—Same—Argument of Counsel—Time of Argument—Discretion of Court.**

Where, upon trial of murder, the court after consultation with counsel on both sides limited the argument of counsel to three hours on each side, and there was no abuse of discretion shown, there was no error.

**4.—Same—Evidence—Threats.**

Where, upon trial of murder, there was much testimony showing the ill-feeling between the parties, and the issue was among others who brought on the difficulty, the court should have admitted testimony that the deceased, some time before the homicide, had stated that he was getting tired of the rough conduct of defendant and was getting badly worried about it.

**5.—Same—Evidence—Declarations of the Defendant.**

Upon trial of murder there was no error in admitting testimony that the defendant some three months before the homicide had declared that the deceased was "an old son-of-a-bitch."

**6.—Same—Evidence—Acts of Defendant.**

Upon trial of murder there was no error in admitting testimony that defendant bought a knife used by him in the difficulty, about a week before the homicide.

**7.—Same—Evidence—Undisclosed Motive of Deceased—Want of Knowledge of Defendant.**

Upon trial of murder it was reversible error to permit the State to introduce testimony that on the evening of the homicide, about half an hour or less before the killing, deceased left his home with his two little boys and went down the road to hunt the cows; there being no testimony that the defendant had notice of the deceased's innocent intentions, and defendant claimed a conspiracy between deceased and his son to attack defendant, and the court should upon request of defendant have withdrawn this testimony from the consideration of the jury. Following Gant v. State, 55 Texas Crim. Rep., 284, and other cases.

**8.—Same—Evidence—Undisclosed Motive of Witness.**

Upon trial of murder it was reversible error to permit the daughter of the deceased to testify that as defendant approached the house of the deceased on the evening of the homicide her brother came out of the yard with a gun in his hand to shoot an owl, notice of the witness' intention to hunt an owl not having been brought home to the defendant; the theory of defense being that the said brother of State's witness was acting together with his father in an attack upon the defendant.

Appeal from the District Court of Kaufman. Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The daughter of the deceased testified substantially that her father had returned from Kaufman, and after seating himself on the gallery for awhile, went down the road with his little boys to look for the cows; that shortly after that the defendant rode up to her father's house and that she and her older brother Jimmy were there together; that defendant asked her brother for a chew of tobacco, and

when he did not get it he rode off in a trot in the direction her father went; that just before this incident that her brother Jimmy, had started to kill an owl with a gun; that when the defendant left the witness and her brother Jimmy also started in the same direction that defendant did, and that when they got out into the road witness saw the defendant kill her father; that she saw the defendant reach over and cut her father; that defendant was on his horse and deecased was standing by the side of the road and her little brothers were with him; that she then ran to her father and that her mother and her brother Jimmy joined her; that she saw defendant first on his horse and afterwards saw him dismount; and that after defendant had cut her father with a knife he remounted his horse and left, saying, "You old, damn fool, you; I'm done with you;" that when she and her mother and brother got to where her father was he was lying on the ground at the side of the road, where he died.

The widow of the deceased testified that after deceased had gone with his little boys to look for the cows, and after defendant left in that direction and while she was in her dining-room, she looked through the window and saw the difficulty, which occurred some sixty-five or seventy yards from the house; that she saw the defendant turn across the road, whirl around and cut two strokes with his right hand at deceased while the latter was right at the horse's head about an arm's length from the defendant; that she did not see anything in deceased's hands; that it was done so quick that she could not state how it was done; that she had seen the defendant rapidly riding towards her husband before the difficulty began; that when she ran out to her husband he was lying out on the side of the main road with his head towards the house; that he was unconscious and never spoke to her; that when she got there her husband's pocketknife was by his side near his left pocket and the knife was closed.   This witness did not notice her son Jimmy until she had got to the body of deceased.

The defendant testified in his own behalf that he was about sixteen years old when the homicide occurred; that on the day of the homicide he started to preaching, passing the house of the deceased, and saw the oldest son of deceased, Jim, standing out near the house loading his gun; that no one was with him at that time; that Jim was about twenty-two years old; that in passing he barely spoke to him and defendant continued down the road and that Jim came in behind him with the gun; that after defendant passed Jim he saw Jim's father coming through the fence, something like two hundred and fifty yards from the house, with his two little boys; that after deceased went through the fence he picked up a stick and started towards defendant, dropping the stick and saying, "Stop, I'm not going to give no road. I'm ready to die.   One of us has got it to do."   That defendant tried to pull out of the road and ride around, but deceased jerked defendant's horse by the nose and

hit him with the end of his knife, which was open; that defendant told him to let him alone, that deceased had the advantage of him, etc., but deceased said, "This is as good as I want," taking hold of defendant's left leg, whereupon defendant gave spurs to his horse, the horse throwing him; that when defendant got to the ground deceased hit him with his fists, nearly knocking him down, and when defendant made at him deceased had his knife open and struck at defendant, and that this was the first time that defendant struck at him; that deceased jumped back and came at defendant again, striking at defendant and defendant striking at him; that the defendant lost sight of the knife—deceased either dropping it or defendant knocking it out of his hand—and that then defendant struck deceased and deceased hollered "Oh;" that then defendant got on his horse, and deceased picked up a stick and hit at defendant, saying, "Damn you, I'll catch you now," and as he made at defendant and staggered over forward the defendant struck him again, and then got on his horse and left; that Jim, the son of deceased, was right close to the defendant when the fight was over and had a gun in his hand, and made an effort to shoot the defendant as he went around the bend; that at the time deceased picked up the stick he said, "Come on, Jim," and commenced running and Jim commenced running. Defendant denied using the language attributed to him by the daughter of deceased.

The defendant also testified to many acts and threats on the part of the deceased against the defendant; that his family and that of deceased were near neighbors, living on farms, and that the children of the families had had trouble and that the deceased had ill-feeling against the defendant. There was also some testimony that a stick of wood was found some ten or fifteen feet from where the body of the deceased lay. This, with the facts stated in the opinion, is a substantial statement of the case, but the evidence is very voluminous.

*A. U. Puckitt* and *Wm. H. Allen* and *H. M. Casnahan* and *Terry & Brown,* for appellant.—Cited cases in opinion.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Appellant was given two years in the penitentiary for manslaughter.

1. Appellant requested the court to charge the jury as follows: "In this case you are instructed that if the deceased prior to the time of the killing had made threats to take the life of defendant or to do him some serious bodily injury, and such threats had been communicated to defendant; and at the time of the killing the deceased by some act then done produced in the mind of defendant the belief that he, the deceased, was about to carry into execution

such threats so made theretofore, and the defendant acting upon such belief killed the deceased, then you will find defendant not guilty and so say by your verdict. And you are instructed that this would be true without regard to whether deceased was or was not a violent and dangerous man; and you are also instructed that such is the law without regard to whether the threats were or were not seriously made, if defendant believed them to have been seriously made; and also that such would be the law without regard to whether the jury believed that deceased was intending to carry into execution such threats, all that is required being that the defendant believed it from some act of deceased. And if you have a reasonable doubt as to whether such belief existed in the mind of defendant at said time you will give the defendant the benefit of such doubt and find him not guilty." This was refused by the court. The court gave the usual charge in regard to threats. After giving the definition of the statute in regard to the question of threats, as applied to the law of self-defense, the court thus applied it: "Now, if you believe from the evidence that the defendant had heard deceased make threats to take his life or do him serious bodily injury, or had been informed that the deceased had made such threats, and that defendant and deceased met in the road and the deceased did some act or acts which, viewed from the defendant's standpoint, reasonably appeared to him to indicate or manifest an intention on the part of the deceased to carry such threats into execution and the defendant cut or stabbed deceased and killed him, you will acquit the defendant upon the ground of threats against his own life." It is admitted by the appellant that the court's charge is correct as far as given, but he insists that it stops short of a proper application of the law to the particular facts of the case. The evidence in brief is that there had been ill-feeling between the appellant and deceased and that deceased had threatened appellant's life, as well as to do him serious bodily injury; and in this connection appellant introduced evidence of the character of the deceased as to the fact that he was a violent and dangerous man. The State introduced evidence to the effect that deceased was not a dangerous man, that is, that he was a peaceable and inoffensive man. Upon the cross-examination of these witnesses, however, it developed that they either knew or had heard that appellant had been engaged in difficulties, on several occasions engaging in fights and had carried his gun for one of his enemies. The evidence was also that deceased was fussy and quarrelsome, and talked a great deal about his troubles. The latter clause of the charge asked by appellant was directed or intended to call the attention of the jury to the fact that even if deceased was not a dangerous man that that would make no difference to appellant if he believed deceased had made an attack on him at the time of the difficulty showing his purpose of carrying into execution his threats. In support of this contention he cites us to authorities, among others,

Miles v. State, 18 Texas Crim. App., 156; Swain v. State, 48 Texas Crim. Rep., 98; St. Clair v. State, 49 Texas Crim. Rep., 479; Buckner v. State, 55 Texas Crim. Rep., 511. We are of opinion that these cases announce the correct rule, and were applicable to those cases. In those cases, however, the ·court was confronted with the proposition that the trial court had limited the right of self-defense from the standpoint of threats so that the appellant's case was placed in the attitude of having such right of self-defense curtailed by the charge given. They are not applicable to the question here presented. The court in this case gave a correct charge on the law of threats, but did not go as far as appellant conceives the charge should have gone. It will be noticed the court's charge informed the jury that if deceased had done some act showing his purpose to execute his threat appellant would be entitled to an acquittal. He did not instruct the jury to view the matter from their standpoint, but from the standpoint of appellant. Nor does the court's· charge inform the jury directly or indirectly that they could consider the fact that if deceased was an inoffensive man that they could take that in any way as detrimental to appellant. The charge left the matter for the jury to decide under his instruction that if the deceased made an attack on appellant or had done some act manifesting his purpose to carry out his threat they should acquit. We are of opinion that the court's charge sufficiently presented the question and there was no error in refusing the requested charge. The charge asked by appellant trenched closely on being upon the weight of the evidence and is somewhat argumentative. The other charges were properly refused, without going into a discussion of them.

2. While Mrs. Tucker, widow of the deceased, was on the stand she was asked by appellant's counsel on cross-examination if she did not hear her husband curse Marion Bradley and tell him he had a good notion to choke him like he was a damned dog. The witness replied he did not say it. Upon redirect State's counsel asked her if her husband ever cursed. Appellant urged objections, unless he should be permitted to introduce evidence contradicting the answer which they anticipated she would make. The court then stated that he would rule upon that question when such evidence was offered. Thereupon counsel for appellant objected to the question, which objection was by the court overruled and the witness answered that she had never heard her husband swear. The court says in order to save time and misunderstanding as to the answer of the witness the court called attention of counsel for the defendant to the answer of the witness as not being that her husband did not swear, but that she had never heard him swear; whereupon counsel for the defendant stated that they would produce the testimony showing she had heard him swear. The court then remarked that possibly it would be better not to make such statement in the presence of the jury in advance of offering the testimony. Counsel for appellant

then stated that he had only intended to say that they would offer evidence accordingly. The court further says there was no bill of exceptions taken to any portion of these proceedings, except the objection to permitting the witness to answer the question as shown in the first part of the bill. This bill was prepared by the court in lieu of one presented by appellant's counsel. It does not appear what the objections were, nor does it appear from the bill that the evidence mentioned by appellant's counsel was ever offered before the jury to the effect that the witness had heard her husband swear. As presented, we do not think there was error in the ruling of the court.

3. Bill of exceptions No. 2 recites that it took about two days to develop the evidence in the case, that part of the case being closed on Friday night. The court stated to counsel, there being a number of attorneys engaged in the case, namely, three representing the State and five representing the defendant, that it would be necessary to have some understanding or limitation upon the argument in order to conclude same in order that the jury might have time to consider the case to some extent on Saturday; otherwise it would be necessary to hold the case over till Monday. Appellant's counsel, after consultation, announced to the court that they would agree to four hours on a side; whereupon the court asked if three hours would not be sufficient, as otherwise the case could not be considered in time for the jury to give it any consideration. There was some demurrer to this on the part of appellant's counsel; whereupon, the court told them that it had only taken about two days to develop the testimony, and it occurred to the court that argument ought to be presented in three days and so limited the argument. Appellant reserved a bill of exceptions. We are of opinion there is no error in this matter requiring a reversal. Matters of this sort are left largely to the discretion of the trial court, keeping in view, however, the legal right of contending parties so that they may have ample opportunity of presenting questions arising in the case fully in a fair way. There was no attempt on the part of the court to limit the number of counsel presenting the case which he was authorized to do, but the limitation was as to the length of time allowed for the argument. We have sustained rulings of the court where less time was given to the side in presenting the argument. We are of opinion there was no error in this matter.

4. Mrs. Calhoun was introduced by appellant and asked with reference to a certain conversation between herself and the deceased with reference to appellant. The State requested the retirement of the jury, which request was granted. After their retirement Mrs. Calhoun stated in answer to inquiry by the appellant in regard to what occurred between herself and the deceased, that she had never heard him say a great deal in regard to appellant, and in one conversation she had with him in speaking of appellant deceased told

her about meeting appellant and that a little hard feeling came up between them. That he did not say a great deal out of the way and was only telling her that he had lost his temper; that she remarked to him, deceased, that he was getting too old a man to be losing his temper, and he said it looked as if he could not talk to the boy without getting mad. She says those were about the words he used. In reply to queries from one of counsel for the State, she said she didn't really remember just how the conversation came up, but they were speaking of the boy at the time; that deceased had met the boy a day or two before and had some little hard feelings; that deceased did not say he was mad in talking to her; didn't think he made any threats about the boy, but expressed regret about his temper. That she, the witness, was talking to him for giving away to his temper as he did, he being as old a man as he was. She said that the deceased said appellant was rough and rather a rude boy in disposition. She said that the deceased, Tucker, was a man who talked a great deal, and she further says to tell the truth she did not pay much attention to what the deceased said, as she never did in a case of that kind. Upon further examination by counsel for appellant the witness stated that deceased never did say he did not have any resentment against the boy, but spoke in rather a positive manner when he spoke of him as being rough and rude; that he said that he, deceased, was just simply getting tired of it and was getting badly worried. That was about the substance of what was proposed to be shown by the witness. The court ruled he would not permit it to go before the jury. The jury were brought into the courtroom and the case proceeded without this testimony. This is not a matter of very great importance, it occurs to us, but in view of a great deal of this sort of testimony being before the jury, we think upon another trial, if offered, it should be admitted. The record discloses the fact that there was a considerable amount of testimony showing the feeling between the parties—much of it along the same line and about of the same character as that offered through the above witness. It might have had some bearing upon the case inasmuch as it was a seriously contested issue as to who was in fault in bringing about the difficulty. The State's theory being that appellant brought on the difficulty, and appellant's contention being that he was attacked by the deceased vigorously and that he fought purely in self-defense. It is not controverted that the deceased had ill-will and hard feelings toward the appellant and had so expressed himself upon divers occasions, and had even threatened to shoot appellant with a gun and beat him up or fix him, etc. This evidence, though not of a very cogent nature, as we view it, would have had a tendency to aid appellant's case as to who probably began the difficulty, especially in view of the fact that at the time of the meeting appellant's evidence showed that deceased pulled him from his horse. Upon another trial this testimony, we think, should go before the jury.

5.   Another bill of exceptions recites that the State was permitted to prove by the witness Yarbrough that at Abner, two or three months before this homicide, that he, witness, and defendant were at Sunday-School and that deceased was at said Sunday-School and was reading or teaching a Bible class, and that the defendant said to the witness, "You do not know Tucker like I do; he is a regular old son-of-a-bitch." Tucker was the deceased. Objection was urged to the introduction of this statement. We are of opinion that this statement was correctly admitted. It tended to show the feeling of appellant toward the deceased.

6.   The State was permitted to prove by the witness Pollard that appellant bought a knife about a week before the homicide from the witness. This knife was identified upon the trial as the one used by appellant in the difficulty. We are of opinion this evidence was admissible.

7.   The State was permitted to prove by Miss Bessie Tucker, and her mother, Mrs. Tucker, daughter and wife of deceased, that on the evening of the homicide, about half an hour or less before the killing, deceased left his home and went down the road in the direction of Kaufman, taking with him his two little boys to hunt the cows. The State's attorney asked Miss Bessie Tucker the question: "What did your father go down the road for?" and Mrs. Tucker the question: "What did your husband go down the road for?" Each replied that he went to hunt the cows. These questions and answers were objected to by appellant on the ground that he could not be bound by anything not reasonably apparent to him; that there was nothing in the record to show that he knew deceased had gone down the road to hunt cows, and was returning from such cow hunt when he met deceased and the killing occurred. These objections were overruled, and the witnesses answered as stated, and upon the argument of the case, discussing how the meeting came about between appellant and deceased, State's counsel argued to the jury that deceased had gone to hunt the cows, and the whole evidence showed the meeting to have been accidental, and appellant's counsel, after the evidence was all in, asked special charge No. 6, instructing the jury not to consider such evidence, because no proof was made of any fact that would remotely tend to put defendant upon notice that deceased·had gone down the road to hunt cows. This special charge was refused, and appellant reserved exception both to the admission of the testimony and the refusal of the court to give the requested instructions to strike out this evidence from the consideration of the jury. Taken in the light of the bill both as to the introduction of the evidence and refusal of the court to eliminate the matter by special charge, we think in view of the entire record and the facts in connection with the son having a gun and the evidence in relation to his innocent purpose, there was error. This was used by State's counsel in argument as

a strong fact against appellant showing the deceased was on a peaceful mission, and had a tendency to place appellant in quite an unfavorable light. It was a serious question in the case as to who began this difficulty, the State's theory being that appellant did, and without any reason or excuse. Appellant's theory was that deceased was the attacking party, and his action was entirely defensive. Appellant was not bound to take notice or be governed by the peaceful mission of deceased, unless the facts would indicate that he was aware of such peaceful mission or purpose. This was evidence directed at a crucial point in the case, and doubtless did place appellant in the attitude before the jury of having brought on the difficulty with a man who was out on a peaceful mission. Under the authorities we are of opinion this evidence was inadmissible, and the court should have given the special charge to withdraw it from the jury, especially so in the light of the argument used by State's counsel. Gant v. State, 55 Texas Crim. Rep., 284; Brumley v. State, 21 Texas Crim. App., 222, 17 S. W. Rep., 140; Johnson v. State, 22 Texas Crim. App., 206, 2 S. W. Rep., 609; Pratt v. State, 53 Texas Crim. Rep., 281; Hunter v. State, 59 Texas Crim. Rep., 439, 129 S. W. Rep., 125.

8. Another bill recites that while Miss Bessie Tucker, daughter of deceased, was testifying, the State was permitted to prove by her that as defendant approached the house of deceased on the evening of the homicide, that her brother, Jimmie Tucker, a boy about nineteen years of age, came out of the yard towards the road which defendant was traveling, and that Jimmie had a gun in his hands, and then asked the witness where Jimmie was going with the gun and what he was going to do with it. Objection was urged to this, because the record did not disclose any fact which would show that defendant knew that Jimmie Tucker was going to hunt an owl, and that defendant could not be bound or prejudiced by the undisclosed intention of Jimmie Tucker in coming out of the yard with a gun in sight of the place where the difficulty occurred and in about 175 yards of the place, and only sufficient time elapsed from the time defendant passed Jimmie Tucker until the difficulty to allow defendant to ride that distance in a gallop, or, as the wife of deceased put it, in a run on his horse. These objections were all overruled, and the witness stated that Jimmie was going to shoot an owl across the road over by the tank dam, all of which was referred to in argument of counsel for the State over appellant's objection. This bill is not clear and explicit, but upon another trial this evidence should not be used against appellant, unless there is some evidence or fact to show that appellant was put upon notice of the purpose or intent of Jimmie Tucker in making his appearance with the gun. One of the theories of appellant was that Jimmie Tucker and his father were acting together in an attack upon him, and that as he passed the house the son came out with a gun going

in the direction of his father, and following appellant, who was also traveling in the same direction along the public road. Upon another trial we are of opinion that if objection is urged to this testimony as it is here presented, it should not be permitted to go to the jury. In order to use this character of evidence against appellant, the State must by some means show that appellant was aware of the purpose of Jimmie Tucker in coming out upon the road and following along behind him with a gun. See authorities already cited on the preceding proposition.

As these matters are presented, we are of opinion that the evidence in regard to the peaceful mission of deceased in hunting his cows, under the circumstances stated, was sufficiently erroneous and injurious to require a reversal of the judgment.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Walter C. Lane, Special Judge, sat in this case.
McCord, Judge, disqualified.