# J. B. GERARD v. THE STATE.

## No. 3735. Decided December 15, 1915.

**1.—Murder—Accomplice—Principal—Definition of Offense.**

There can be no accomplice criminally until it has been shown that the principal committed the offense, and that the accomplice previously advised him or furnished the means by which the crime was committed by the principal, and where defendant was indicted and tried as an accomplice to murder, and the evidence was sufficient to authorize the finding that he was an accomplice if his principal was guilty of murder, the conviction would be sustained. Davidson, Judge, dissenting.

**2.—Same—Charge of Court—Defense of Life and Property.**

Where, upon trial of murder, the defendant was charged as an accomplice, and the evidence raised the issue that defendant's principal who committed the homicide shot the deceased after he had burglarized defendant's house, and when he was within gunshot of the building burglarized, the jury should have been instructed that in that case the alleged principal would not be guilty, and that defendant should be acquitted. Davidson, Judge.

**3.—Same—Rule Stated—Protection of Life and Property—Statutes Construed.**

Where, upon trial of murder, where defendant was indicted as an accomplice, the evidence showed on the part of the defense that the principal shot and killed the deceased while the latter was fleeing from the home of the defendant which he had just burglarized, the court should have submitted this issue under articles 1104 and 1105, Revised Penal Code. Following Newman v. State, 58 Texas Crim. Rep., 443, and other cases. Davidson, Judge.

**4.—Same—Charge of Court—Manslaughter.**

Where defendant was tried as an accomplice to a murder committed by his principal, and the evidence raised the issue that if the principal committed the homicide it was of no higher degree than manslaughter, the court should have charged the jury that if the principal was guilty only of manslaughter then the defendant could not be guilty as an accomplice, and a negative charge on this subject was not sufficient. Davidson, Judge.

**5.—Same—Independent Impulse—Charge of Court.**

Where the defendant was indicted and tried as an accomplice to murder, the evidence raised the issue that the principal who did the killing acted upon an independent impulse with which the defendant was not connected in any way, the court should have submitted the issue to the jury. Davidson, Judge.

**6.—Same—Evidence—Declarations of the Defendant—Reconciliation.**

Where, upon trial of an accomplice to murder, the State showed that the defendant was the father both of the principal and the deceased, and that ill-feeling existed between the parties for some time before the homicide; that is, between the defendant and the principal on the one side, and the deceased on the other, there was no error in admitting testimony that three or four years before the homicide occurred the deceased was in jail charged with some dereliction and that his father, the defendant, called to see him at the jail, and while there used vigorous denunciatory language towards the deceased and spat in his face, and this although there was some testimony as to a reconciliation thereafter between defendant and deceased. Davidson, Judge, dissenting.

**7.—Same—Evidence—Declarations of Witness.**

Where defendant was tried as an accomplice to murder, and the State was permitted to introduce testimony as to denunciatory language used by defendant towards the deceased while the latter was in jail, some three or four years

before the homicide, and spat in the face of the deceased, the remarks and conduct of the person who witnessed and testified to the same should not have been admitted in evidence.

### 8.—Same—Evidence—Letter—Declarations of Third Parties.

Upon trial of murder by an accomplice there was no error in admitting in evidence a certain letter written by an attorney for the deceased as his attorney with reference to some litigation between the deceased and the defendant and which was signed by the deceased and addressed to the defendant to show that the deceased had no ill-will against the defendant as claimed by the latter; provided, it was shown that defendant received such letter, which, in the opinion of a majority of the court, it does. Davidson, Judge, dissenting.

### 9.—Same—Exculpatory Statements—Self-defense—Charge of Court.

Where a defendant was tried as an accomplice to murder, and the State used the statements of the principal in the homicide as to the incidents attending the killing, which exonerated the latter as well as the defendant of guilt, and the court charged generally on self-defense, but did not submit this theory of the law to the jury, the same was reversible error. Following Pharr v. State, 7 Texas Crim. App., 472.

### 10.—Same—Self-defense—Charge of Court.

Where, upon trial of murder of an accomplice, the State introduced in evidence the confessions of the principal which raised the issue that the deceased burglarized defendant's premises at night and that the principal pursued the deceased and the latter brought on the difficulty, that phase of the case should have been submitted to the jury.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder as an accomplice; penalty, five years imprisonment in the penitentiary.

*Pazdral & Coston* and *Taylor & Forrester,* for appellant.—On question of insufficiency of the evidence; to show that defendant advised or conspired with the principal to commit the homicide: Cooper v. State, 69 Texas Crim. Rep., 405.

Upon question of right of principal to kill the deceased while fleeing from theft or burglary: Whitten v. State, 29 Texas Crim. App., 504, and cases cited in the opinion.

Upon question of exculpatory statements: Pharr v. State, 7 Texas Crim. App., 472; Jones v. State, 29 id., 20; Cook v. State, 71 Texas Crim. Rep., 532, 160 S. W. Rep., 465; Combs v. State, 52 Texas Crim. Rep., 613; Pratt v. State, 53 id., 281.

On question of self-defense: Souther v. State, 18 Texas Crim. App., 352; Johnson v. State, 19 id., 545.

On question of admitting defendant's declaration to deceased three or four years prior to homicide: Grant v. State, 42 Texas Crim. Rep., 273; Bryan v. State, 49 id., 200, and cases cited in opinion.

On question of opinion of witness: Barnard v. State, 45 Texas Crim. Rep., 67; Hardin v. State, 40 id., 208; Funderburk v. State, 64 S. W. Rep., 1059.

Upon question of undisclosed motives of deceased: Brumley v. State,

21 Texas Crim. App., 222; Gant v. State, 55 Texas Crim. Rep., 284; Bradley v. State, 60 Texas Crim. Rep., 398, 132 S. W. Rep., 488; Cook v. State, 71 Texas Crim. Rep., 532, 160 S. W. Rep., 465.

*C. C. McDonald,* Assistant Attorney General, for the State.

DAVIDSON, Judge.—Appellant was charged with and convicted of being an accomplice to Joe Gerard. The case is one of homicide.

The theory of the State was, Joe Gerard did the killing, and that appellant, his father, was his advising accomplice before the homicide, not being present nor participating in the killing. In order to sustain the verdict of the jury and judgment of the court it was necessary to show that Joe Gerard was guilty of murder, and that his father advised him before the killing not only to do the killing, but that such killing under the advice would be murder. It was necessary, therefore, that the State show such culpability of both parties. If Joe Gerard was not guilty of murder, then appellant could not be, there being no accomplice to the offense of manslaughter, and, of course, if Joe Gerard acted in self-defense he could not be guilty of murder, nor appellant, his father, be guilty as an accomplice. It is always necessary, in proving a case against a defendant charged as being an accomplice, to show the culpability of the principal. There can be no accomplice, criminally speaking, until it has been shown that the principal committed the offense, and that the accomplice previously advised him or furnished the means by which the crime was committed by the principal. This is so by the statute, and all the decisions necessarily must follow the statute, and have done so where correctly decided.

In substance, the evidence shows that Joe Gerard, the alleged principal, killed his brother, Charlie Gerard, at night, at the home and residence of appellant and Joe Gerard. The evidence further shows that the deceased was over twenty-one years of age and had been a wild, reckless boy, criminal in many respects, and a violent and dangerous character, and had made threats not only against his father's life, but against Joe, his brother, and the whole family residing at appellant's home. He had made threats to destroy the property of his father as well as to take the life of all the family. The deceased had served two terms in the penitentiary for forgery, and had been convicted of misdemeanors, and had been compelled to work out in whole or in part the fines and suffer the punishment imposed in such misdemeanors. Appellant had assisted his boy in paying some of these matters and relieving him as far as he could from punishment upon the promise of the boy to reform and lead a different life. It became useless, and he refused further to assist him. The deceased had forged appellant's name several times as well as that of his uncle, if not others. Finally, when the father ceased paying these forged checks and assisting him otherwise, on two different occasions he was sent to the penitentiary for forgery. He had been out of the penitentiary but a short time at the time of this homicide, and it seems he had been out of jail in

Waco but a very short time, a few days at most, and on the day preceding the homicide at night he had gone from Waco to West, near where he was raised and near where his father resided. It is shown further that the mother of the deceased had died years ago and a relative of his seems to have been his guardian; at least, the evidence shows that this uncle settled with him in regard to his mother's property after he reached his majority and paid him some money out of the property he inherited from his mother. A short time prior to the homicide and before his return to West, deceased had filed suit against his father for four thousand dollars, alleging this to be his interest in his mother's estate. He had gone to West during the day preceding the homicide at night, and had seen his father and a party named Hruska, who was interesting himself in this litigation. Either Hruska, or by the advice of Hruska, he had seen his father, as also by the advice of his attorney, Stewart, who resided in Waco, to get his father to pay the amount he claimed. He interviewed his father in the evening in regard to the matter, who, declined to pay him anything, "not even five cents," stating that if he got anything he would get what the law would give him, and whatever the law would give him he, the father, would pay. While in jail two or three days before his return he wrote his brother Joe a letter in which he stated, in substance, that he was going to kill Joe, his father and the whole family. He was heard to make threats of a similar nature on the evening preceding the killing at night. One witness testified that he stated he was going out that night and kill a son-of-a-bitch. It is also shown that he had been depredating upon his father's property at night, and going to his house over the injunction of his father. The evening after interviewing his son and ascertaining the threats of the boy, appellant went to the justice of the peace, Mr. Moore, in regard to the matter, and without going into details on this subject, either from Mr. Moore's testimony or the defendant's or the other witnesses, Mr. Moore told him under the circumstances he would have a right to defend his home and his life against intruders who undertook to destroy his property or take his life. It is shown in this connection that appellant interviewed Joe Gerard, principal, and told him of the circumstances, and asked him if he had any cartridges. Joe told him he had, but in fact he did not have. He also informed Joe of the interview with the justice of the peace. Joe went to Mr. Watt's and secured two cartridges. These cartridges were used in bringing about the homicide that night. These cartridges were secured after night from Mr. Watt. There are some statements to the effect that the old man had interdicted the deceased from coming on his place any more; that he had been a bad boy, and he did not want him about the place; that he had been stealing from him and forging his name and doing other things of that sort, and he did not want him about him any longer. There is testimony by the State, contradicted by other witnesses, that other remarks by appellant made in the presence of the constable, Mr. Russell, after the homicide, when Russell went to the place where the homicide occurred.

These were, in substance, that appellant refused to let the body of the boy be brought in his house after he was killed, and refused to, pay for embalming the body of the deceased. This testimony is supposed to have been introduced to intensify the feeling of ill-will of appellant towards his son and enhance the idea that this bitterness may have entered into the reason for the killing. Appellant lived about a mile and a half from the town of West. Deceased was in West in the evening. Joe, the alleged principal, testified that he got the two cartridges from Mr. Watt, which is verified by Mr. Watt, and took them home, got his gun, and went to sleep upon the gallery, His father was also sleeping on the gallery. Joe Gerard took the gun and laid it down by him, or covered it up near where he was sleeping. During the night he testifies he heard a noise in what is termed the wine room or wine house, where appellant had a couple of barrels of wine and may be a small barrel of whisky. Wine had been stolen from this room on several occasions, and it seems that deceased may have taken this wine. In this connection it might be well enough to state that a brother of the deceased, Willie Gerard, testified that his brother Charlie, while in the calaboose or jail in West, sent for him. He went to see him and deceased asked his brother to steal enough wine out of his father's wine house or room to pay for a couple of guns with a view of going into robbing express trains. Willie did not do it, and it seems deceased threatened his life. So he, Willie, left home and went away to live with another brother for a while. The State, however, met the fact that Willie left home with evidence to the effect that his father had virtually compelled him to leave home, or placed matters in such relation about him he decided to leave home. Willie Gerard also testified that deceased told him that their stepmother had offered him five hundred dollars to poison appellant. He desired Willie's assistance in this matter. This was communicated to appellant, and it brought up a family disturbance, which was finally settled, the stepmother denying having anything to do with the matter or making such offer. This was settled to the satisfaction of appellant, and he and his wife continued to live together. On the night of the homicide, as before stated, Joe Gerard, the alleged principal, and the appellant were sleeping on the gallery, Joe Gerard having the gun. When he heard the noise in the wine room he asked, "Who is that?" Receiving no answer, he called again, stating that if they did not answer he, would shoot. A man then jumped out of the window of the wine room and ran. Appellant chased and caught up with him. When he overtook the party he ascertained the fact it was his brother, the deceased. It seems the night before, or a night or two before this, someone had been about the place and the dogs had chased him away and into a cane patch. This, of course, was not deceased, because he was then in Waco; at least, there is no evidence of the fact he was in West, the evidence rather indicating he was not. When Joe Gerard overtook his brother, his brother said to him, "Either I kill you or you kill me." In the scuffle over the gun it was discharged, but without purpose to kill under

the statement as shown. Anyhow, no result occurred so far as wounding deceased was concerned. When this occurred deceased turned loose the gun, picked up a brick bat close by, threw at and struck Joe Gerard, whereupon Joe Gerard shot and killed him.

There is another fact introduced by the State that ought to be stated. It is this: That in the evening when appellant was talking with his son Charlie, the deceased, he told him he must keep away from his place; that if he came to his place he would kill him like he would a mad dog. It is also in evidence that appellant and Joe Gerard mentioned the fact between them or discussed it, that the deceased had made these threats, both by letter and in person, to Joe Gerard and to the father, and that the justice of the peace told him if he came around there at night trying to kill them he had a right to protect his property, and, to use the expression of appellant, he remarked to Joe Gerard that the justice of the peace told him under such circumstances "he would have the right to shoot after him" or to "shoot after anybody." This may be a sufficient statement of the evidence to review the questions at issue. The record is very voluminous, going into many details, a great deal of which was rather prolix.

Under this state of case appellant contends the State has not shown that he was guilty of advising his son, Joe Gerard, to kill the deceased, at least, unless the deceased undertook to destroy his property or steal it or commit burglary or to kill those at his home. The writer is clearly of the opinion the State has failed to show by any evidence that appellant advised or counseled or urged Joe to kill the deceased, unless it be under the circumstances mentioned, and that he would not be guilty of advising a murder under such facts. In order to render appellant guilty it must be shown beyond a reasonable doubt that appellant advised Joe to kill deceased, and under such circumstances, the killing having occurred, that it would be murder on the part of the slayer. To the writer's mind it is clear the only advice he gave him, if he advised him to kill the boy any more than anybody else, was only in defense of his property or of the lives of those who resided with him.

The court submitted the theory of self-defense as to Joe with reference to the immediate facts of the homicide wherein he shot his deceased brother on account of the difficulty, the throwing of the brick bat and incidental matters occurring then. The body of the deceased was found near the house. The witnesses vary as to the distance from about one hundred feet to seventy-five yards. It seems also under the contention of the State that under the facts if the deceased was the man who was in the wine room, and the State contests the fact that the boy was in the wine room, but if he was the party who was in the wine room, that he fled and that Joe Gerard followed him and engaged in the difficulty with him at the point designated, therefore he had forfeited all rights to do the killing under the law of justifiable homicide, which authorizes such killing where the party was committing theft at night or burglary or undertaking to kill, etc. The court did not submit the issue of the defense of life under that statute. Charges

were asked and exceptions taken to the court's refusal to so charge. These are timely preserved and presented in voluminous exceptions, applying the testimony under each contention from the record to such contention. The bills are lengthy and present every possible phase of the case from the testimony and all manner of exceptions were fully reserved. We are of opinion that this phase of the law should have been given. The guilt of Joe Gerard, who did the killing, was necessary to the guilt of appellant as an accomplice. If Joe Gerard killed to defend himself against the attack of his brother the jury should have been so instructed, and under such circumstances he would not be guilty, and, therefore, his father would not be guilty. This particular phase of the law was fairly well given by the court. The jury should have been further instructed that if Joe Gerard, the alleged principal, killed the deceased after he had burglarized the house or was stealing the wine, and when he was within gunshot of the building, Joe would be justifiable under the statute which authorizes such killing under such circumstances, and in that event appellant would not be guilty. If he advised Joe to kill anybody who came to his house, even his son, for the purpose of burglarizing his house or for any sinister purpose at night, Joe would be justified under the statute, and appellant could not be guilty as an accomplice, because the question of murder would then be eliminated. None of this phase of the law was given by the court, though exception was taken to the charge for failing to do so, and requested instructions asked. These questions have been discussed and decided in quite a number of cases, and appellant was clearly entitled to have this phase of the law given the jury. As to the proposition that in order to justify a conviction of appellant as accomplice to murder, and that the evidence must show beyond a reasonable doubt that the principal had committed murder and no less degree of homicide than murder, see Cooper v. State, 60 Texas Crim. Rep., 405.

On the proposition that appellant or his son, either or both, had a right to protect their home under the circumstances, and as shown under the terms of the statute, see for collation of authorities Branch's Crim. Law, sec. 458; Laws v. State, 26 Texas Crim. App., 643; Whitten v. State, 29 Texas Crim. App., 504; Newman v. State, 58 Texas Crim. Rep., 443, and White's Penal Code, art. 675, subdiv. 8. See also in reference to this matter Revised Penal Code, 1911, arts. 1104 and 1105. Section 8 of that article has not been changed in the revision. Article 1104 reads as follows: "Homicide is permitted in the necessary defense of person or property under the circumstances, and subject to the rules herein set forth." Section 8 of article 675, White's Penal Code, article 1105, Revised Penal Code, applies to cases of this character in this language: "In case of burglary and theft by night, the homicide is justifiable at any time while the offender is in the building or at the place where the theft is committed or is within reach of gunshot from such place or building." Of course, it is justifiable homicide under the same statute, so far as Joe Gerard, the actual slayer, is concerned, in defense of his person. In this connection to emphasize the fact

this charge should have been given, it is conceded that deceased was in the town of West late in the evening making the threats already mentioned, and that his father lived a mile and a half from town. It is necessarily true that the deceased went to his father's house, covering that distance of a mile and a half, and was there at the point where the tragedy occurred. This is not to be controverted, because the deceased was killed at that point. He, therefore, went to this place for some purpose. The evidence also shows for the defendant that the facts stated as to chasing him from the wine room and subsequent matters leading to the killing already mentioned are true. It seems also not to have been controverted that in the wine room one of the barrels of wine had been unlocked and the wine was running from the faucet just immediately after the transaction, and there was wine in a vessel and some on the floor. The State sought to minimize this, but the fact remained that the wine room was in this condition. It is also in evidence for the defendant that somebody had been previously coming to this wine room and taking out wine as well as whisky. Somebody had been there the night previous or a night or two prior to this killing. The dog had chased him away, and he escaped. If the deceased went to his father's house and entered the wine room, it was necessarily a burglarious entry for the purpose of committing theft. This was in accord with the previous threats he had made. If Joe, the alleged principal, killed the deceased while he was in gunshot reach of the premises, he would be justified under the quoted statute, and the fact that appellant advised him to kill anybody or to "shoot after anybody" who came there under such circumstances, would not make him an accomplice to murder. There can be no question, that if deceased had remained away from the premises that night this killing would not have occurred. He was there for some purpose, and over and against the interdiction of his father. If appellant advised his son to kill this boy or anybody else who came there at night committing burglary or theft or for the purpose of killing the family, or if the principal in the case believed that at the time as the evidence presented itself to his mind he had a right justifiably to shoot, his father could not be guilty as an accomplice. These matters should have been given fully in charge to the jury.

The jury should have been also specifically and affirmatively and pertinently charged that if Joe Gerard was guilty only of manslaughter, then the defendant could not be guilty as an accomplice and not negatively as was done. The statute so provides, and it could not be otherwise, because manslaughter arises from adequate cause producing sudden passion. The fact there could be an accomplice to the principal in a homicide carried with it the idea that there had been an agreement between the parties, the accomplice doing his part but not being present, the principal executing the design. This could not be so in manslaughter under the statute. Of course, if there was self-defense in the case, appellant could not be guilty. Again, if the State's theory was right, or the court's idea of the law correct, that the principal,

Joe Gerard, killed the party not under the protection of articles 1104 and 1105, supra, but killed him after chasing him away and under circumstances that would make him guilty of murder, then in order to constitute appellant guilty as an accomplice there must be something shown that he advised the killing under such circumstances that articles 1104 and 1105 would not apply. Appellant knew nothing of the actual transaction, for he was asleep; did not hear the shots. His advice or suggestion to his son Joe was that the justice of the peace advised him he had a right to "shoot after anybody" who came to his house to rob his house or kill the people. This could not make him guilty as an accomplice if homicide occurred under those circumstances. If Joe Gerard killed deceased independent of such suggestion and of his own volition and under circumstances that did not bring him under his father's advice or command, then appellant would not be responsible. Branch's Crim. Law, sec. 242. It would be a killing upon an independent impulse of Joe Gerard about which his father had not advised. So from any possible viewpoint of this case, appellant was entitled to this charge and he should have been accorded a full and affirmative charge on his theory of the law under the facts.

We deem it unnecessary to take up each one of these separate charges and matters and discuss them separately. We have said enough in a general way to cover the whole matter so the court will understand that the law of justifiable homicide in defense of property, home and life was involved in such manner it should have been given in charge to the jury.

A bill of exceptions shows that three or four years before this tragedy occurred a witness testified that deceased was in jail charged with some dereliction and his father called at the jail to see him, and while there used vigorous denunciatory language towards the boy, and the witness also testified that the father spat in the boy's face. The father, appellant, admitted going to the jail but denied the remaining portion of it. However, there were objections urged to this testimony, as it was shown that after this matter, conceding that it occurred, there had been an adjustment between deceased and appellant and that trouble had been eliminated by such friendly relations. The father had helped his son in many ways after this transaction. The writer is of opinion this testimony ought not to have been admitted, but the majority believe it admissible, but not the remarks and conduct of the witness. Where matters of this sort occur and there has been a reconciliation and it is shown that friendly relations subsequently exist and time intervenes and the killing occurred not from that matter, or from any connection with that matter, but on account of subsequent events, such prior trouble is inadmissible. There are quite a number of cases which seems to make this a well settled rule. We might cite, among others, Grant v. State, 42 Texas Crim. Rep., 273; Bryan v. State, 49 Texas Crim. Rep., 200; Kelly v. State, 18 Texas Crim. App., 262; McAnally v. State, 73 S. W. Rep., 405; Gilbraith v. State, 41 Texas, 567.

There is another matter occurring at the same time as testified by

the witness: That when the father spat in the face of his son in jail, witness used the following language to the father: "He (the witness) told the old man the boy might be guilty of the charge against him but that he, Charlie Gerard, was a better man than he, J. B. Gerard, was, when he, a father, would spit in his son's face." The bill recites that this was told in dramatic language before the jury and was calculated to and apparently did materially prejudice the jury against him. Timely objection was urged. This denunciatory statement made by the witness to appellant at the time, three or four years before this trial, should not have been admitted. The witness may have been indignant, as he says he was, because the father spat in the boy's face, but his indignation or opinion about the matter as to the conduct of the father was not permissible to be used against the father in this case. He may have been indignant and thought it unbecoming of the father to so treat his boy, but his feelings about the matter would not be testimony, and especially so as the thing occurred three or four years before and there had been reconciliation between the father and son. In this connection see Barnard v. State, 45 Texas Crim. Rep., 67; Hardin v. State, 40 Texas Crim. Rep., 208; Funderburk v. State, 64 S. W. Rep., 1059. Many cases might be cited if deemed necessary.

There is another bill of exceptions reserved to the ruling of the court permitting W. H. Stewart, lawyer of the deceased and a member of the Waco bar, to testify to conversations, plans, suggestions and acts occurring in the office of the witness in Waco between such witness and the deceased, Charlie Gerard, appellant not being present and knowing anything of these matters. It seems that deceased while confined in the Waco jail on some criminal matters had employed W. H. Stewart and Alva Bryan, attorneys, to bring suit against his father for his interest in his deceased mother's estate, and after being released from jail went to the office of Mr. Stewart. Appellant and his son Joe, the alleged principal, were not present or knew nothing of it. They were at West at the time, some miles distant from Waco. A letter was then written by Mr. Stewart addressed to the defendant on May 27th. This letter was written supposedly in the interest of the deceased in regard to litigation over the estate of deceased's dead mother. The letter is as follows:

"Waco, Texas, May 27th, 1914.

"Mr. John B. Girard, West, Texas.

"Dear Father: I understand from friends who have visited me in Waco that you are just a little worried because I instituted suit against you in the courts here.

I have no desire to take advantage of anyone, and all I want is my part of my mother's estate, and when I get this I shall leave the State and go into business for myself.

I am willing to make a reasonable compromise with you and save you a lot of extra expense, and if you will come to Waco I will be glad to talk to you about the matter, and if settled within the proper way I am sure we can make things more satisfactory.

I have two good lawyers employed, and have given them assurance that I will go away and not bother you if treated fairly in this matter.

Your son,

Chas. Girard."

This letter was introduced over various objections, it being shown that appellant had never received the letter and knew nothing of it. The court approves this bill with the qualification "that it was the contention of defendant that Charlie Gerard went to West on the day of the killing for an unlawful purpose, towit: to take the lives of his father and other members of the family, in pursuance of previously made threats which were introduced in evidence. It was the State's contention that he had no such purpose in mind but went to see his father on the peaceable mission of attempting to settle a lawsuit that he had filed against him for an alleged share of his mother's estate." Signed officially by the trial judge. The contention alluded to by the judge in his qualification was part of the case, and if this letter had been brought to the attention of the defendant it might have been used in the case, because in that event he would have been apprised of its contents. But in the absence of the fact that the appellant knew it, it certainly could not have any effect upon his mind nor upon that of the principal, Joe Gerard. Facts occurring between third parties are not admissible against a party accused of crime, however material they may be one way or the other, nor do they affect the purpose or intent of the accused unless those facts are called to his attention. He must know of the facts before he can be held responsible for them in his action. There is no issue as to who began the difficulty in this case. Undiscovered testimony or unknown facts to the accused can not be used against him in determining his intent. This is a very familiar rule long known and well settled. Brumley v. State, 21 Texas Crim. App., 222; Johnson v. State, 22 Texas Crim. App., 206; Ball v. State, 29 Texas Crim. App., 107; Fuller v. State, 30 Texas Crim. App., 554; Gant v. State, 55 Texas Crim. Rep., 284; Bradley v. State, 60 Texas Crim. Rep., 398, 132 S. W. Rep., 488; Cook v. State, 71 Texas Crim. Rep., 532, 160 S. W. Rep., 465; Branch's Crim. Law, sec. 477.

The State used statements of Joe Gerard as to the incidents attending the killing, which exonerated him as well as his father of guilt. The court charged generally on self-defense, but did not submit this theory of the law. This he should have done. This has been the law in Texas since the Pharr case, 7 Texas Crim. App., 472. This will be given proper attention on another trial, if one should occur.

In writing this opinion the different matters with reference to charges and correlated matters have not been gone into seriatim as reserved in bills of exception and presented in motion for new trial and argued in brief. But as the matters are all correlated they can be disposed of satisfactorily for a correct decision of the case in the manner we have treated them. So the court will understand upon another trial that the deficiencies in the charge must be covered. But the writer wishes

to say that he does not believe the facts in this case are sufficient to show that appellant ever advised an unlawful killing of his son. In regard to the above expression the majority do not agree with the writer.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

HARPER, Judge.—I agree to reversal of case, but do not concur in the disposition of some of the questions. I think the facts sufficient to authorize a finding that appellant was an accomplice, if Joe Gerard was guilty of murder. Deceased had not received any money from his mother's estate, but only from his grandmother's estate. The testimony as to what appellant did and said at the jail when he visited it was admissible, in the light of appellant's testimony. The letter written by Mr. Stewart for deceased to his father would be admissible, if it is shown that appellant received it, and I am inclined to think the evidence sufficiently shows that fact. While we do not think the evidence at all conclusive that deceased was stealing from his father the night he was killed, or burglarizing the premises, yet the confession of Joe, introduced in evidence by the State, raised that issue, and if the facts on another trial show, as they do on this trial, that Joe pursued, and deceased brought on the difficulty, that phase should be presented. I do not care to discuss the record further, only to say that in the statement of the case appellant's contention of the facts is stated, and the State's theory almost entirely ignored, and if it is stated, as contended for by the State, we think it would be demonstrated that the evidence would fully support a verdict of guilt.

PRENDERGAST, Presiding Judge.—I am not now satisfied fully as to what disposition should be made of this case, but for the present am inclined to think it should be reversed.

Since writing the above, I add: I do not concur in all Judge Davidson has written, but do agree with what Judge Harper has written. I reluctantly agree to a reversal.