**Tuan Anh DANG, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–00–00560–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 31, 2002.

Rehearing Overruled March 6, 2003.

Mike DeGeurin, Houston, for appellant.

Donald W. Rogers, Houston, for appellee.

Panel consists of Justices ANDERSON, HUDSON, and FROST.

## MAJORITY OPINION

KEM THOMPSON FROST, Justice.

A juvenile court certified fifteen-year-old appellant Tuan Anh Dang as an adult. After the juvenile court transferred appellant to the trial court, he was indicted and tried for capital murder. The jury found appellant guilty, and the trial court assessed appellant's punishment at confinement in the state penitentiary for life. On appeal, appellant asserts the trial court erred: (1) in not suppressing his oral statement because it allegedly was taken in violation of the Texas Family Code; (2) in refusing requested jury instructions; and (3) in limiting closing argument to twenty minutes. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 5, 1999, Binh Nguyen, the complainant, was working a shift from 4:00 p.m. to midnight as a machinist at a business owned by Son Dang, appellant's father. Tan Pham, another machinist at Dang's business, was to begin his shift at

midnight. Typically, the employee in the building kept the door locked from the inside and would unlock the door for the next arriving employee. Pham arrived at work at 11:45 p.m. and knocked on the door. Binh did not answer. Pham noticed the doorknob had holes around it. Peering through a hole in the door, Pham saw Binh lying on the floor with his head toward the door. Pham went home, called Dang (the shop owner), and asked him to come to his house. When Dang arrived, Pham told him what he had seen. Dang called the police and then the two of them went to the shop.

Officer Kerr Richards of the Houston Police Department received a call from the police dispatcher at 12:11 a.m. on January 6, 1999, to go to the machine shop. When he approached the building, he saw that a side door was open. As he maneuvered through the yard, Richards noticed a body lying inside the front section of the building. Richards immediately advised the dispatcher to send an ambulance. Through the same open doorway, Richards also observed an Asian female walking from the location of the body toward the east side of the building, and two Asian males in the back section ransacking some desks. Richards was not able to see into the front section of the building. Concerned that a fourth person might be in the front part of the building, Richards returned to his police car to call for help. As he retreated, Richards heard three gun shots coming from inside the building. Believing he was under fire, Richards dove behind his police car. Richards then saw an Asian male come to the side door and pull it shut.

Unaware of the danger, Son Dang, the shop owner, and Tan Pham pulled into the

shop parking lot. Officer Richards immediately advised them to move across the street because the scene was not secure. Other police officers arrived within a few minutes and set up a perimeter around the building. Shortly thereafter, SWAT officers arrived and took charge of the scene.

Police later apprehended appellant and Linda Nguyen [1] outside the building. Officers recovered a semiautomatic cartridge from appellant's front pants pocket and ten empty nine-millimeter shell casings from his back pocket. The police placed appellant and Linda in separate police cars. This occurred sometime between 1:30 a.m. and 1:50 a.m. Shortly thereafter, the police captured Quynh Tran and Kenneth Tran [2] and placed them in separate police cars.

Homicide investigators, Sergeant G.J. Novak and Officer Henry Chisolm, arrived at the crime scene at 3:00 a.m. and 3:30 a.m., respectively. No one had access to the building until 3:10 a.m., when SWAT officers relinquished control of the crime scene. Novak interviewed Linda, Quynh, Kenneth, and appellant separately as each sat in a separate police car. Novak interviewed appellant last at 3:45 a.m. At approximately 4:00 a.m., Novak had these four individuals transported to the homicide office at 1200 Travis in downtown Houston.

At 5:45 a.m., Sergeant Ted Bloyd met appellant at the homicide office. Bloyd left appellant in the homicide office's family room to attend the interviews of Linda and Quynh. Based on information he learned in those interviews, Bloyd considered appellant a suspect. At 7:20 a.m., Bloyd returned to the family room and found appellant asleep on a couch. Bloyd woke appellant and informed him that he

---

1. Linda Nguyen and the complainant Binh Nguyen are not related.

2. Quynh Tran and Kenneth Tran are not related.

was now considered a suspect. Bloyd then took appellant to a magistrate for the administration of his legal warnings. Very soon thereafter, Bloyd and appellant returned to the homicide office, where, at 8:36 a.m., Bloyd reminded appellant of his legal warnings and recorded appellant's oral statement. The interview ended ten minutes later.

At appellant's trial, the State offered appellant's confession and the testimony of other witnesses to show that on the night of the murder, appellant and his friend, Quynh Tran, went to appellant's father's machine shop to steal money believed to be on the premises. Quynh, armed with a nine-millimeter pistol, and appellant attempted to enter through a side door routinely used by employees, but soon discovered the door was locked. However, Binh Nguyen was working in the shop. Recognizing appellant as the owner's son, Binh unlocked the door and permitted the youths to enter the building.

As Binh returned to his duties, Quynh told appellant to kill Binh because Binh would tell appellant's father they had been at the shop. Quynh handed the pistol to appellant. Appellant claims he could not bring himself to shoot the machinist, so he engaged the safety on the gun, pulled the trigger, and told Quynh the gun had jammed. Although ballistics tests indicated Binh was shot with two different pistols, appellant stated in his confession that Quynh alone shot Binh. In any event, Binh was shot several times.

Appellant claims that, immediately after the murder, Quynh and he quickly searched the premises. They discovered and took a nine-millimeter pistol appellant's father kept at the shop, but could find no money. While leaving the premises, Quynh fired several rounds at the side door in an attempt to make it appear the murder and robbery had been initiated by a forced entry. Appellant said that when he saw Quynh shooting holes in the door, he thought, "This is fun ... I wonder if I can hit it." Appellant then used his father's gun to shoot at the door.

After an unsuccessful search for money, appellant and Quynh went back to their apartment to get a crowbar. Once at the apartment, they told Linda Nguyen what they had done and called in another friend, Kenneth Tran. Quynh told Kenneth, "We shot and killed somebody. We need to go back to the shop." Kenneth noticed that Linda was crying and appellant was calmly wiping down a pistol with a towel. Believing his friends would reward him with a fair share of the money, Kenneth agreed to return to the shop and act as a lookout while appellant, Quynh, and Linda searched the premises for the elusive cache of money. It was while Linda, Quynh, and appellant were at the shop for the second time that evening that Officer Richards arrived on the scene.

The trial court denied appellant's motion to suppress the oral statement that he made at 8:36 a.m. on January 6, 1999. The State introduced that statement as evidence during appellant's trial for capital murder. Appellant requested jury instructions regarding the voluntariness of his oral statement and regarding alleged violations of the Texas Family Code by the police. The trial court charged the jury regarding the voluntariness of appellant's oral statement but refused appellant's other proposed jury instructions. The jury convicted appellant of capital murder, and the trial court assessed appellant's punishment at confinement in the state penitentiary for life.

## II. ISSUES PRESENTED

Challenging his conviction for capital murder, appellant asserts the following issues on appeal:

(1) Did the trial court abuse its discretion by denying appellant's motion to suppress his oral statement, allegedly obtained in violation of sections 52.02 and 52.025 of the Texas Family Code? (first, second, and third issues);

(2) Did the trial court err in refusing appellant's requested jury instructions concerning compliance with sections 52.02(a), 52.02(b)(1), and 52.025(d) of the Texas Family Code? (fourth issue); and

(3) Did the trial court abuse its discretion in limiting closing argument to twenty minutes? (fifth issue)

### III. MOTION TO SUPPRESS ORAL STATEMENT

 Generally, we review a trial court's ruling on a motion to suppress under an abuse-of-discretion standard of review. *Oles v. State*, 993 S.W.2d 103, 106 (Tex.Crim.App.1999). However, in this case, the resolution of the suppression issues does not turn on an evaluation of credibility and demeanor, and the facts relating to the suppression issues are not disputed. Therefore, we apply a de novo review. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *Jeffley v. State*, 38 S.W.3d 847, 853 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). In determining whether the trial court's ruling on a motion to suppress is supported by the record, we generally consider only the evidence adduced at the hearing on that motion unless the suppression issues have been consensually relitigated by the parties during the trial on the merits. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex.Crim. App.1996). Because the parties in this case consensually relitigated the suppression issues at trial, we will examine the trial evidence as well as the evidence from the suppression hearing.

**Did the trial court abuse its discretion by denying appellant's motion to suppress based on an alleged unnecessary delay under section 52.02(a) of the Texas Family Code?**

In his first issue, appellant claims the trial court abused its discretion in overruling his motion to suppress his oral statement because it was obtained in violation of section 52.02(a) of the Texas Family Code. Under this section, once children are in police custody, the police must take them without unnecessary delay to a juvenile processing office. *See* TEX. FAM.CODE § 52.02(a). Appellant, who was fifteen years old at the time, argues the police unnecessarily delayed taking him to a juvenile processing office based on the length of time they detained him in the police car at the scene of the murder.

We begin by observing that the legislature has designed special procedures and created a specific nomenclature for dealing with juvenile suspects. A juvenile, for example, technically cannot be "arrested," but he "may be taken into custody ... pursuant to the laws of arrest." TEX. FAM. CODE § 52.01(a)(2). Thus, "[t]he taking of a child into custody is not an arrest except for the purpose of determining the validity of taking him into custody or the validity of a search under the laws and constitution of this state or of the United States." TEX. FAM.CODE § 52.01(b). Moreover, the police do not process a child taken into custodial detention through a "booking room," but rather through a "juvenile processing office." *See* TEX. FAM.CODE § 52.025. Finally, in most circumstances, the police do not confine a child in a "jail," but in a "certified juvenile detention facility." *See* TEX. FAM.CODE § 51.12.

Though we recognize that a child can only be "taken into custody" or "detained," but never "arrested," the use of this terminology can be confusing, particularly when

we must evaluate the validity of a juvenile's custody by applying the laws and constitutional provisions relating to the arrest of adult suspects. Accordingly, in our analysis, for the sake of clarity, hereafter we will refer to appellant's "temporary detention" and/or "arrest," though we recognize those terms are technically inappropriate when used with respect to a juvenile.

When the police take a suspect into custody, they either "arrest" or "temporarily detain" him. "A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant." TEX.CODE CRIM. PROC. ANN. art. 15.22 (Vernon 1977). However, this "restraint of liberty" standard is not adequate when distinguishing between an arrest and a detention because it is a characteristic common to both. *See Francis v. State*, 896 S.W.2d 406, 410 (Tex.App.-Houston [1st Dist.] 1995, pet. dism'd). Whether a particular seizure of a person is an arrest or merely a temporary detention is a matter of degree and depends upon the length of the detention, the amount of force employed, and whether the officer actually conducts an investigation. *See Woods v. State*, 970 S.W.2d 770, 775 (Tex. App.-Austin 1998, pet. ref'd).

A "temporary detention," sometimes known as an "investigative detention," must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Balentine v. State*, 71 S.W.3d 763, 770–71 (Tex.Crim.App. 2002). To temporarily detain a person for investigative purposes, an officer need have only "specific and articulable facts which, in light of a police officer's experience and personal knowledge taken together with rational inferences from those facts, would reasonably warrant the intru-

sion upon a citizen's freedom." *Hawkins v. State*, 758 S.W.2d 255, 259 (Tex.Crim. App.1988). For a temporary investigative detention to be valid, the following factors must be present: (1) an unusual activity must be occurring or have occurred; (2) the accused must be connected with the suspicious activity; and (3) the suspicious activity must be connected with crime. *Davis v. State*, 829 S.W.2d 218, 219 n. 2 (Tex.Crim.App.1992). Moreover, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Davis v. State*, 947 S.W.2d 240, 245 (Tex.Crim.App. 1997). Finally, an investigative detention may be founded upon a reasonable, articulable suspicion while an arrest must be supported by probable cause to be constitutionally valid. *Morris v. State*, 50 S.W.3d 89, 94 (Tex.App.-Fort Worth 2001, no pet.).

The Legislature has declared that when the police take a juvenile into "custody," he first must be taken, "without unnecessary delay," to a "juvenile processing office." *See* TEX. FAM.CODE § 52.02(a). Thus, the question presented is whether a juvenile, like an adult, may ever be "temporarily detained" in the field. In other words, if a police officer seizes a juvenile while conducting an investigative detention, must the officer immediately transport the juvenile to a juvenile processing office, or may the officer conduct a preliminary investigation in the field before deciding whether to "arrest" the suspect? Appellant contends section 52.02(a) becomes operative anytime the police take a juvenile into "custody."

Section 52.02(a) of the Family Code lists six specific procedures that police may perform at a juvenile processing

office.[3] All of these functions are consistent with what are generally regarded as "booking procedures"; none relate to a continuing police investigation of the underlying offense. Thus, we find that when, in section 52.02(a), the Legislature refers to the taking of a child into "custody," it means custody resulting from an arrest, not a temporary detention. Accordingly, the police may detain a juvenile temporarily during an investigation in the field in the same manner as they detain an adult. Only when a juvenile has been "arrested" must he be transported to a juvenile processing office.

Next, we must decide at what point appellant was arrested because, once arrested, the police were obliged to transport him without unnecessary delay to a juvenile processing office. The record indicates the police apprehended appellant, patted him down, and placed him in the back of a police car between 1:30 a.m. and 1:50 a.m. The police did not transport appellant from the crime scene to the homicide office until approximately 4:00 a.m. Thus, the police held appellant at the scene for approximately two-and-a-half hours.

In determining whether a juvenile was under arrest, we consider whether, based on the objective circumstances, a reasonable child of the same age would believe his freedom of movement was significantly restricted. *See Jeffley,* 38 S.W.3d at 855. In each situation, the determination of custody is based entirely on objective circumstances. *State v. Stevenson,* 958 S.W.2d 824, 829 & n. 7 (Tex. Crim.App.1997).

In its findings of fact and conclusions of law, the trial court determined that appellant "would have been *arrested* at the scene of the offense and placed into custody sometime after 1:00 a.m. on January 6, 1999" (emphasis added). However, as previously stated, we conduct a de novo review in this case because the resolution of the suppression issues does not turn on an evaluation of credibility and demeanor, and the facts surrounding appellant's detention or arrest are not disputed. *See Guzman,* 955 S.W.2d at 89.

Appellant agrees this court should determine de novo whether he was under arrest when first placed in the police car; however, appellant claims the undisputed evidence proved the police had arrested appellant at that time. Appellant relies on the testimony of Officer Chisolm, who arrived at the scene at 3:30 a.m., after the police had placed appellant in the police car. Officer Chisolm testified that, when he arrived, appellant was in the custody of Officer Taylor and that it is Officer Chisolm's understanding that appellant "was placed in custody somewhere around 1:30[sic] to 1:50[sic]." This testimony does not specify whether Officer Chisolm meant that the police had arrested appellant or whether they had detained him temporarily. In any event, there was no evidence Officer Chisolm's understanding concern-

---

**3.** The only procedures the police are authorized to conduct at a juvenile processing office are the following: (1) release the child to a parent, guardian, custodian, or other responsible adult upon that person's promise to bring the child before the juvenile court as requested by the court; (2) bring the child before the office or official designated by the juvenile board if there is probable cause to believe that the child engaged in delinquent conduct or conduct indicating a need for supervision; (3) bring the child to a detention facility designated by the juvenile board; (4) bring the child to a secure detention facility as provided by section 51.12(j); (5) bring the child to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment; or (6) dispose of the case without referral to the court as authorized under section 52.03. *See* TEX. FAM.CODE § 52.02(a).

ing when appellant "was placed in custody" was manifested to appellant. Therefore, Officer Chisolm's subjective belief that appellant was "in custody"—whatever he meant by that—is irrelevant to our de novo determination of whether the police had arrested appellant or temporarily detained him. *See Stevenson*, 958 S.W.2d at 829 & n. 7 (subjective beliefs of the police not relevant unless they were manifested to suspect). Instead, we must analyze the objective circumstances. *See id.*

The record reflects that at approximately 2:00 a.m., homicide detectives were awakened at their homes and instructed to report to the crime scene. In the meantime, SWAT officers were in control of the scene, as they were in the process of making certain the building and surrounding environs were safe for homicide detectives. The police did not know at that time whether more witnesses, victims, or suspects remained in the building. The SWAT team released the scene at 3:10 a.m., marking the first opportunity homicide detectives had to examine the victim, premises, and other physical evidence. Sergeant Novak began to interview Quynh, Linda, Kenneth, and appellant to determine the significance of their presence at the crime scene. After these individuals gave conflicting statements, Novak had them transported to a juvenile processing office—the homicide office at 1200 Travis. The act of detaining appellant in a police car while the scene was being cleared by SWAT officers does not necessarily show he was under arrest. *See In the Matter of E.M.R.*, 55 S.W.3d 712, 717–18 (Tex.App.-Corpus Christi 2001, no pet.) (holding child not considered under arrest until he gave statement implicating himself). Instead, the record indicates police did not consider appellant a suspect until after they noticed inconsistencies in statements of the four individuals found near the crime scene. As late as 3:30 a.m., Lieutenant Maxey, who was in charge of the homicide investigation, advised Sergeant Bloyd that he was still trying to determine whether these four young people were witnesses or suspects. Thus, the record indicates the police temporarily detained appellant and his companions to preserve the status quo while the building was being cleared.

 We are mindful, of course, that a temporary detention must be *temporary*, i.e., of as short a duration as possible to effectuate the purpose of the stop. *See Davis*, 947 S.W.2d at 245. However, there is no rigid, "bright-line" time limitation beyond which a temporary detention becomes a *de facto* arrest. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). "Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Id.* In assessing whether a detention is too long in duration to be justified as an investigative stop, the United States Supreme Court has held that we are to consider:

> ... whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. (citations omitted). A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. (citation omitted). A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive'

means does not, itself, render the search unreasonable." (citations omitted). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it. *Id.*, 470 U.S. at 686–87, 105 S.Ct. at 1575–76.

■ When analyzing the facts of a particular case to determine whether the police acted reasonably in detaining a defendant for a particular length of time, we may consider, for example, such factors as the seriousness of the offense under investigation;[4] whether it was necessary to search a premises or vehicle as part of the investigative stop;[5] whether it was necessary for officers to detain the suspect to maintain the status quo while interviewing witnesses;[6] whether the police needed to interview multiple suspects to determine if there were discrepancies in their stories;[7] whether the length of the detention seriously interrupted the suspect's travels;[8] and whether it was necessary to effectuate reasonable safety precautions.[9] In other words, "in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575.

■ Here, the police had evidence that at least one homicide, possibly a capital murder, had been committed. Because shots had been fired from within the building when the first officer arrived, police had reason to believe that armed suspects remained in the building. Moreover, the building had several entrances and multiple rooms, making any search of the premises a highly dangerous exercise. Police also knew that Officer Richards had observed three Asian young people (two males and a female) inside the building moments after he arrived on the scene. After establishing a perimeter, the police eventually found four Asian young people (three males and a female) outside, but near, the building. A homicide detective, who had been awakened at his home and summoned to the scene, interviewed each of the young people separately to compare their stories and try to determine whether they were witnesses or suspects. The record does not suggest that, at the time of their detention, either appellant or his companions were driving an automobile, attempting to board a plane, walking to work, or otherwise "traveling."

4. *See* 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.2(f) at 66 (3d ed.1996).

5. *See Meeks v. State,* 653 S.W.2d 6, 12 (Tex. Crim.App.1983) (where police detained suspect long enough to permit them to inspect truck parked on vacant lot to see if it had been broken into after police observed defendant walking from lot in early morning hours and location was high crime area in which there had been number of automobile break-ins), *overruled on other grounds by Holcomb v. State,* 745 S.W.2d 903, 906 (Tex.Crim.App. 1988).

6. *See Mays v. State,* 726 S.W.2d 937, 944 (Tex.Crim.App.1986) (where police detained defendant while interviewing witness who had called police).

7. *See United States v. Bautista,* 684 F.2d 1286, 1290 (9th Cir.1982) (where police continued temporary detention while they separately interviewed two suspects and asked them to explain certain suspicious circumstances).

8. *See United States v. Moore,* 22 F.3d 241, 247–48 (10th Cir.1994) (holding that impairment of suspect's travel plans is especially intrusive).

9. *See United States v. McRae,* 81 F.3d 1528, 1535 n. 6 (10th Cir.1996) (holding it is permissible for officer to take time to run criminal history check on motorist before approaching vehicle in traffic stop to promote officer safety).

Finally, all of these events occurred in the dead of night, further slowing the pace of the police investigation and increasing the hazard of injury. Under these circumstances, we find the police did not arrest appellant until Sergeant Novak had him transported from the scene at approximately 4:00 a.m., after the four young people had given conflicting statements, indicating that appellant was a suspect. Accordingly, we conclude the police did not unnecessarily delay in transporting appellant to a juvenile processing office after arresting him at approximately 4:00 a.m. *See In the Matter of E.M.R.*, 55 S.W.3d at 717–18.

■■■■■ Even if we were to conclude the police had arrested appellant when they first placed him in the police car, we still would find that any delay in taking appellant to the juvenile processing office was a necessary delay. Section 52.02(a) requires the police to transport an arrested juvenile to a designated juvenile processing office without unnecessary delay and therefore contemplates the possibility of a "necessary" delay. *Contreras v. State*, 67 S.W.3d 181, 185 (Tex.Crim.App.2001). Whether a delay is necessary is determined on a case-by-case basis. *Id.* The evidence in this case supports a finding that any delay was attributable to the police and SWAT team securing the crime scene. The evidence indicates that securing the building and perimeter was necessary to preserve the integrity of the crime scene and protect potential witnesses or victims.

Nonetheless, appellant argues a two–hour–and–45–minute delay is unnecessari-

ly long. However, we do not judge the necessity of a delay solely by its length. Nor do we make a determination as to the necessity of a delay in a vacuum; rather, we consider the circumstances of each case and evaluate each scenario according to its own peculiar facts. In some cases, a detention of more than a few minutes might be unreasonable. Under most circumstances, a detention lasting approximately two-and-a-half hours would be a *de facto* arrest, but the situation the police found themselves facing here left them with few options. The evidence showed the crime occurred in the middle of the night and involved multiple suspects, an unsecured scene, and the possibility of multiple victims. Any delay was merely the result of a response to the demands of the particular situation. *See In the Matter of J.D.*, 68 S.W.3d 775, 783 (Tex.App.-San Antonio 2001, pet. denied) (holding that two-and-a-half-hour delay was necessary for police to secure crime scene). In this context, we find nothing unreasonable about the pace of the police investigation or the length of the investigative detention. Accordingly, we find the police did not unnecessarily delay appellant's transportation to a juvenile processing office in violation of section 52.02(a) of the Texas Family Code.[10] We overrule appellant's first issue.

**Did the trial court abuse its discretion by denying appellant's motion to suppress based on the parental-notification requirement of section 52.02(b) of the Texas Family Code?**

In his second issue, appellant claims his oral statement was not admissible because

---

10. We note that when the police transported appellant, the journey from the crime scene to the juvenile processing office took approximately ninety minutes. Whether the police deviated from the most expeditious route or otherwise delayed appellant's arrival at the juvenile processing office, we cannot discern

from the record before us. Appellant did not challenge this anomaly at the suppression hearing. Further, appellant did not accuse the police of stopping, deviating, or engaging in unreasonable conduct in driving him to the juvenile processing office, and thus, the record is silent in this regard.

the police obtained it in violation of section 52.02(b) of the Family Code. Section 52.02(b) provides:

A person taking a child into custody shall promptly give notice of the person's action and a statement of the reason for taking the child into custody, to:

(1) the child's parent, guardian, or custodian; and

(2) the office or official designated by the juvenile board.

TEX. FAM.CODE § 52.02(b). Appellant does not complain of a failure to notify the office or official designated by the juvenile board, but claims his parents were not promptly notified that he was in custody or of the reason he was in custody.

■■■ The police placed appellant in the police car at the scene between 1:30 a.m. and 1:50 a.m. Appellant left the scene in a police car at approximately 4:00 a.m., and he arrived at the juvenile processing office at 5:45 a.m. At approximately 8:45 a.m., appellant gave a statement implicating himself in the capital murder. Appellant's parents were given formal notice that he was in custody later that day at approximately 3:00 p.m. Significantly, however, Son Dang, appellant's father, came to the crime scene shortly after the victim's body was discovered. At the crime scene, appellant's father identified his son to police and saw appellant sitting in the back of a police car. Appellant's father also saw his son being transported from the scene. When asked whether he received notification, Son Dang testified, "I was there. I didn't think no one need to call me. I was at the scene all the time, but I don't get any information about that." Appellant's father further testified he knew what had happened at the machine shop, but did not

know any details or what he should do next. The trial court found that Son Dang was present when the police placed appellant in the police car and thus had actual knowledge that his son was in police custody and the circumstances surrounding that action. Section 52.02(b) does not require any more notice than what Dang received at the scene.

Appellant cites to *Hampton v. State*, 36 S.W.3d 921 (Tex.App.-El Paso 2001), *rev'd* —— S.W.3d ——, 2002 WL 31116647, at *1–*5 (Tex.Crim.App. Sept.25, 2002) and *In the Matter of C.R.*, 995 S.W.2d 778 (Tex.App.-Austin 1999, pet. denied), for the proposition that, even when the parents of a juvenile are aware that their child is being taken to the police station, the Family Code nevertheless requires that police formally notify the parents as to the reason the juvenile has been taken into custody. Here, appellant's father not only had actual knowledge that his son was in police custody, but also testified he knew why his son had been taken into custody. Appellant's father knew that his son often took friends to his business to play pool on a billiards table located in the machine shop, that one of his employees had been murdered, and that his son and several of his son's companions were found near the scene shortly after the murder. Accordingly, appellant's father had actual knowledge of both the fact that his son was in police custody and the reason therefore, so there was no violation of section 52.02(b).

■■■ Even if we were to find that appellant's father's actual knowledge did not satisfy the requirements of the statute, appellant did not show a causal connection between the delayed formal notice and his oral statement.[11] *See Gonzales v. State*, 67

---

11. We note in this regard that appellant's father was free to retain legal counsel for his son. However, even though appellant's father had actual knowledge that his son was in police custody, the record reflects that appellant's father did not visit him until appellant

S.W.3d 910, 913 (Tex.Crim.App.2002). We overrule appellant's second issue.

### Did the trial court abuse its discretion by denying appellant's motion to suppress based on sections 52.025(c) and 52.025(d) of the Texas Family Code?

■ In his third issue, appellant claims his oral statement was inadmissible because the police violated sections 52.025(c) and (d) of the Family Code. Those statutes provide:

> (c) A child may not be left unattended in a juvenile processing office and is entitled to be accompanied by the child's parent, guardian, or other custodian or by the child's attorney.
>
> (d) A child may not be detained in a juvenile processing office for longer than six hours.

Tex. Fam.Code § 52.025(c),(d).

Appellant first contends he was left unattended in the family room at the juvenile processing office from 5:45 a.m. until 7:20 a.m. in violation of section 52.025(c). However, appellant did not assert this contention either in his written motion to suppress or at the hearing on his motion to suppress. Therefore, appellant did not preserve error on this complaint. *See Jeffley*, 38 S.W.3d at 853.

■ Even if appellant had preserved error, he could not prevail on his argument under section 52.025(c) of the Texas Family Code because it lacks merit. The record reflects that Officer Bloyd placed appellant in the family room at 5:45 a.m. and returned at 7:20 a.m. to find appellant asleep. At that time, Officer Bloyd woke appellant and took him to a magistrate so that appellant could be informed of his rights. Though there was evidence at trial

had been transported to the juvenile detention center and did not contact a lawyer for appel-

that appellant was alone in the family room from 5:45 a.m. to 7:20 a.m., there was no evidence that the police failed to attend, watch, or guard appellant from outside the family room. Therefore, there was no evidence that appellant was left unattended while he was in the family room. In addition, appellant did not show a causal connection between allegedly being left unattended in the family room and his oral statement. *See Gonzales*, 67 S.W.3d at 913.

■ Appellant further contends the trial court should have suppressed his oral statement because the police held him in the juvenile processing office for more than six hours. The record reflects that appellant was in the juvenile processing office from 5:45 a.m. until approximately 12:25 p.m., an interval slightly longer than six-and-a-half hours. From 5:45 a.m. to 7:20 a.m., appellant slept in the family room. At 7:30 a.m., he was taken to the magistrate and read his rights. At 8:00 a.m., he was returned to the juvenile processing office, where he gave his oral statement, which ended at 8:46 a.m. From 9:00 a.m. until 12:10 p.m., appellant remained in the family room. At 12:10 p.m., appellant telephoned his father, and at 12:25 p.m., appellant began his journey to the juvenile detention center.

Before appellant gave his statement, the police detained him in the juvenile processing office for less than two hours while he slept. After the statement, the police detained him for another three-and-a-half hours. Appellant finished giving his oral statement three hours after arriving at the juvenile processing office—halfway through the six-hour limit of section 52.025(d) of the Texas Family Code. Ap-

lant until two days after the offense.

pellant did not show a causal connection between the length of his stay in the juvenile processing office and his oral statement. *See Gonzales,* 67 S.W.3d at 913. We overrule appellant's third issue.

## IV. REQUESTED JURY INSTRUCTIONS

In his fourth issue, appellant asserts the trial court erred in refusing appellant's requested jury instructions that appellant's oral statement could not be considered as evidence against him unless the jury found that police complied with sections 52.02(a), 52.02(b)(1), and 52.025(d) of the Texas Family Code. *See* TEX. FAM.CODE §§ 52.02, 52.025(d).

▮▮▮▮ The State claims that appellant did not preserve error as to his fourth issue. A complaint of error in the jury charge may be preserved by asserting an objection or requesting an instruction. *Vasquez v. State,* 919 S.W.2d 433, 435 (Tex. Crim.App.1996). An adverse ruling must be obtained to preserve error on an objection, but not on a special requested instruction that is called to the trial court's attention. *See id.* Citing to this court's decision in *Arana v. State,* the State argues appellant waived this complaint because he did not mention the omissions of which he now complains on appeal when the trial court initially denied his requested instruction at the charge conference. *See Arana v. State,* 1 S.W.3d 824, 826 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd). *Arana* is not on point. In that case, the defendant submitted his proposed instructions in an entire proposed charge. *Id.* at 827. The trial court used the State's proposed charge, which did not contain the defendant's desired instruction, as a working draft. *Id.* Though the defendant raised certain matters as the trial court went through the charge, he did not mention the omission of the instructions about which he complained on appeal. *Id.* In

finding the defendant had waived his complaint on appeal, this court observed that the defendant's "omitted instructions were buried within his eight page proposed jury charge and were not among the matters appellant raised during the charge conference." *Id.* at 828. Here, the trial court was aware of appellant's proposed instructions, as appellant tendered his proposed instructions separately, and the trial court denied the proposed instructions, both orally and in writing. Appellant has preserved error. Accordingly, we now turn to the merits of appellant's claim.

Appellant contends the evidence at trial raised a factual issue as to whether police obtained his oral statement as a result of the alleged violations of sections 52.02(a), 52.02(b)(1), and 52.025(d) of the Texas Family Code. Article 38.23(a) of the Code of Criminal Procedure governs issues relating to the exclusion or admission of evidence allegedly obtained in violation of the Family Code. *See* TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2002); *Gonzales,* 67 S.W.3d at 912–13. Appellant was entitled to an article 38.23 instruction regarding the alleged Family Code violations only if the trial evidence raised a factual issue concerning whether the police obtained appellant's statement as a result of their violation of one of these provisions. *See* TEX.CODE CRIM. PROC. ANN. art. 38.23(a); TEX. FAM.CODE §§ 52.02, 52.025(d); *Gonzales,* 67 S.W.3d at 912-13; *Bell v. State,* 938 S.W.2d 35, 48 (Tex.Crim.App.1996). In other words, we must determine whether the evidence at trial raised a factual issue as to whether the police obtained appellant's oral statement as a result of one or more of the following: (1) the alleged unnecessary delay in taking appellant to a juvenile processing office after taking him into custody; (2) the alleged failure to promptly and properly notify appellant's parents that appellant was in

custody; and (3) the alleged detention of appellant in a juvenile processing office for longer than six hours. We conclude the evidence presented at trial did not raise any factual issues in this regard.

 The undisputed evidence at trial showed: (1) the police did not unnecessarily delay in taking appellant to a juvenile processing office after taking him into custody; (2) appellant's father had actual knowledge that his son was in custody and the reason therefor; (3) there was no causal connection between appellant's oral statement and any alleged delay in notifying appellant's parents that appellant was in custody; and (4) there was no causal connection between appellant's oral statement and the length of appellant's stay in the juvenile processing office. Therefore, the trial court did not err in refusing to give the jury an article 38.23 instruction regarding the alleged Family Code violations. Accordingly, we overrule appellant's fourth issue.

## V. Limitation on Closing Argument

In his fifth issue, appellant claims the trial court abused its discretion in limiting his closing argument to twenty minutes. Appellant complains that this time limitation prevented his counsel from adequately addressing: (1) the two different theories under which appellant could be found to have committed robbery; (2) whether appellant intended to permanently deprive his father of property; (3) the fact that appellant was not aware of Quynh's intent or conduct; (4) the trial court's charge on the law of parties and conspiracy; (5) the credibility of the police officer who took appellant's confession; and (6) the different theories under which appellant could be found guilty of capital murder, felony murder, or murder.

In limiting closing argument to twenty minutes, the trial court noted there was only a day and a half of testimony and reminded counsel that argument is not evidence, but only summation. After objecting to the time limitation, defense counsel pointed out to the jury in a somewhat cursory fashion that the charge allowed them to convict appellant of capital murder, felony murder, or murder. He argued the evidence showed a reasonable doubt that appellant intended to rob the complainant. He argued the definition of reasonable doubt and the voluntariness of appellant's statement. Defense counsel also challenged the credibility of the State's witnesses, including Kenneth Tran and Officer Bloyd. He argued that appellant committed no robbery, but Quynh wanted to make the scene "look like a robbery." Counsel further informed the jury that the reasonable doubt standard applied to the charge on conspiracy and the law of parties. At that point, the trial court informed defense counsel that his time had run. Counsel asked for "three more minutes," and the trial court denied his request. After the State's argument concluded, appellant's counsel again petitioned the trial court for additional time, stating, "I was unable to adequately summate the nine different ways the State had alleged that a crime occurred and to apply the facts to that summate [sic] to summarize the facts with each one to show why the State had not proved their case." The trial court again denied counsel's request for additional time. We must now determine if the trial court abused its discretion in refusing to allow appellant's counsel any more time for closing argument.

 Closing argument is of fundamental importance in a criminal trial. *See Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975). For the accused, a concise, persuasive argument could mean the difference between liberty and unjust imprisonment. *Id.,* 422

U.S. at 863, 95 S.Ct. at 2556. The closing argument presents a valuable opportunity to summarize the evidence as the defense sees it and explain why the jury should render a not guilty verdict—or, in some cases, a guilty verdict on a lesser charge. A trial court may not deny a felony defendant the opportunity to make a closing argument, but the court has broad discretion in the regulation and duration of it. *See Herring,* 422 U.S. at 858–62, 95 S.Ct. at 2553–55; *Hernandez v. State,* 506 S.W.2d 884, 886 (Tex.Crim.App.1974).

■ Placing reasonable time limitations on closing argument is a necessary and sound practice to protect the rights of all defendants to a speedy trial. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. Given the crowded trial dockets and the critical need to conduct criminal trials in a timely and efficient manner, trial courts must be diligent time managers. This is one reason they are given great latitude to limit the duration and scope of closing arguments. *See Herring,* 422 U.S. at 862, 95 S.Ct. 2550. Though it may sometimes present a genuine challenge for counsel to successfully complete closing argument within the time allotted, the mere existence of this difficulty does not mean the court abused its discretion in setting the restriction. *See, e.g., Decker v. State,* 734 S.W.2d 393, 394–95 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd) (trial court did not abuse discretion in limiting closing argument to fifteen minutes even though appellant presented bill of exceptions showing 24–minute–long argument that appellant wanted to make). Yet, "there is a limit on how quickly a case can be ordered to proceed without infringing on a defendant's constitutional right to a fair trial." *Kemph v. State,* 12 S.W.3d 530, 534 (Tex.App.-San Antonio 1999, pet. ref'd) (noting in dicta that allowing the defendant's counsel a six-minute closing argu-

ment might have been an abuse of discretion). As Justice Hudson points out in his eloquent and thoughtful dissent, a trial court must not encroach on a defendant's valuable Sixth Amendment right to representation by placing unreasonable time restrictions on closing arguments.

■ Texas courts have long recognized that in cases involving grave offenses and complex issues, the better practice is to allot a more generous amount of time for closing argument. *See Jenkins v. State,* 60 Tex.Crim. 236, 131 S.W. 542, 545 (App. 1910) ("We would suggest, therefore, that trial judges should not unduly limit counsel in their arguments, and that in all cases involving capital punishment it is the better practice to allow counsel ample opportunity to present the questions fairly, thoroughly, and fully before the jury."). Following this practice helps to ensure that defendants have ample opportunity to present the evidence as they see it and to demonstrate why the jury should rule in their favor. Deciding the appropriate amount of time for closing argument is not an exact science, and the trial court has broad discretion in deciding how much time is warranted. *See Hernandez,* 506 S.W.2d at 886. Nonetheless, it is better to err on the side of giving too much time than on giving too little.

■ The Texas Code of Criminal Procedure does not address the length or duration of closing arguments but leaves the trial court with broad discretion to regulate these matters. *See Hernandez,* 506 S.W.2d at 886. In reviewing the trial court's decision, we view the record in the light most favorable to the trial court. *See Dubois v. State,* 164 Tex.Crim. 557, 301 S.W.2d 97, 101 (App.1957). The reasonableness of the time limitation depends on the facts and circumstances of each case. The factors we consider in determining whether the trial court's time allotment

was an abuse of discretion include: (1) the quantity of the evidence; (2) conflicts in the testimony; and (3) the complexity of the issues. *Bell v. State*, 768 S.W.2d 790, 803 (Tex.App.-Houston [14th Dist.] 1989, pet. ref'd). In grappling with the issue of reasonable time limitations on closing argument, Texas courts also give particular attention to whether defense counsel was able to complete the task and meet defense objectives in the time allotted. *See Arevalo v. State*, 835 S.W.2d 701, 707 (Tex. App.-Houston [14th Dist.] 1992, no pet.) (finding no abuse of discretion where record reflected counsel argued for 17 minutes and "covered all relevant issues in the case very cogently"). Even when the trial court places strict limits on the time for closing argument, if the record indicates the defense was able to cover what it set out to cover, appellate courts typically find no abuse of discretion. *See, e.g., Wyatt v. State*, 23 S.W.3d 18, 29 (Tex.Crim.App. 2000) (finding appellant forfeited his right to complain on appeal when defense counsel used only 38 of his 45 minutes, and noting that counsel was not cut off by the trial court and had not asked for additional time or identified matters he had been unable to cover); *Plattenburg v. State*, 972 S.W.2d 913, 918 (Tex.App.-Beaumont 1998, pet. ref'd) (finding no abuse of discretion in limiting argument to 35 minutes when trial court had not cut off argument, defense counsel had not requested additional time at end of argument nor identified matters he desired to discuss with jury which he had not yet covered). These courts seem to reason that if trial counsel adequately covered the necessary points, no additional time was warranted, even if the trial court did not allot much time in the first place. Here, defense counsel asked the trial court for more time, specifically explaining that he had been unable to cover the nine different ways the State had alleged that a crime occurred and to apply the facts to

each to show how the State did not prove its case. The trial court refused to give him even three more minutes to complete the task.

In deciding whether the court's firm twenty-minute limitation was an abuse of discretion in this case, we must consider the complexity and seriousness of the offense as well as the volume of evidence and the conflicts in the testimony. *See Bell*, 768 S.W.2d at 803; *see also Arevalo*, 835 S.W.2d at 706–07 (upholding a fifteen-minute time limit in a felony case where only four witnesses testified and one issue was contested); *Mullen v. State*, 722 S.W.2d 808, 817 (Tex.App.-Houston [14th Dist.] 1987, no pet.) (finding no abuse of discretion in an aggravated robbery case when the trial court limited closing argument to thirty minutes); *Decker*, 734 S.W.2d at 395 (finding that a fifteen-minute limitation in aggravated robbery case was not an abuse of discretion). As the dissent notes and as the record demonstrates, the complexity of the issues and the gravity of the offense suggest that presenting the case to the jury in just twenty minutes was a challenging task even for appellant's very able trial counsel. There were several different theories under which the appellant could have been found guilty. In fact, it took longer to read the charge to the jury than defense counsel was given to argue it.

Complex criminal cases often involve many witnesses as well as voluminous and contradictory evidence, and under these circumstances, a trial court generally would not be acting within its discretion to limit the closing argument to twenty minutes. In this case, however, the only issues were whether appellant's statement was voluntary and whether appellant was guilty of capital murder, felony murder, murder, or not guilty of any offense. Based on appellant's statement and the

evidence at trial, the primary issue before the jury was whether appellant was guilty of capital murder or a lesser-included offense. Though a total of eleven witnesses testified in the span of a day and a half, only one witness testified for the defense, so there were few conflicts in the testimony. The entire trial, including voir dire, lasted less than two days.

This court has found no abuse of discretion in cases with similar facts. In *Bell*, the trial court placed a thirty-minute limit on the closing argument of a five-day felony trial. *See Bell*, 768 S.W.2d at 803. Although the case involved a very serious offense—solicitation to commit capital murder—there was very little evidence. *Id.* In *Bell*, the State presented all the evidence, and there were few conflicts in the testimony. *Id.* The *Bell* court found no abuse of discretion. *See id.* Other courts have upheld similar time limitations in capital-murder trials. *See, e.g., Plattenburg*, 972 S.W.2d at 918. Likewise, in appellant's case, there was limited trial testimony, and the State presented all of it, except for the testimony of appellant's father, who was not present during the commission of the offense.

Though no particular facts are determinative, the facts in this case suggest that twenty minutes might be the least possible amount of time a trial court could set and still not abuse its discretion. By limiting the closing argument to just twenty minutes, the trial court came precariously close to crossing the line. Indeed, it is difficult to understand the trial court's refusal to give defense counsel just three more minutes of argument in a capital-murder trial. However, we do not judge the trial court's decision by our own standards, i.e., by how much time we would have allotted under the same circumstances; rather, we view the record in the light most favorable to the trial court and

determine whether the trial court acted arbitrarily, unreasonably, or without regard to guiding legal principles. *See Lyles v. State*, 850 S.W.2d 497, 502 (Tex.App.-Houston [14th Dist.] 1993, no pet.). Applying that standard of review, the trial court did not abuse its discretion. Accordingly, we overrule appellant's fifth issue.

## VI. CONCLUSION

The trial court did not abuse its discretion in denying appellant's motion to suppress his oral statement based on his allegation that the police violated sections 52.02(a), 52.02(b), 52.025(c), and 52.025(d) of the Texas Family Code. Nor did the trial court err in refusing appellant's requested jury instructions regarding sections 52.02(a), 52.02(b), and 52.025(d) of the Texas Family Code. The evidence at trial did not raise a factual issue concerning whether the police obtained appellant's oral statement as a result of their alleged violation of one of these provisions. Finally, the trial court did not abuse its discretion by limiting appellant's closing argument to twenty minutes. Having overruled all appellant's issues, we affirm the trial court's judgment.

HUDSON, J., dissenting.

J. HARVEY HUDSON, Justice, dissenting.

I join the majority in its disposition of appellant's first four issues. In his fifth issue, however, appellant claims the trial court abused its discretion in limiting closing argument to twenty minutes. Because I agree with appellant, I respectfully dissent.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. CONST. amend. VI. "The Constitutional right of a defendant to be heard through counsel necessarily includes his

right to have his counsel make a proper argument on the evidence and the applicable law in his favor." *Yopps v. State*, 228 Md. 204, 178 A.2d 879, 881 (1962); *see also Arnold v. State*, 68 S.W.3d 93, 102 (Tex. App.-Dallas 2001, pet. ref'd) (holding that denial of jury argument may constitute a denial of the right to counsel). Thus, the "argument of a cause is as much a part of the trial as the hearing of evidence." *Meredeth v. People*, 84 Ill. 479, 481 (1877). Yet, over the last century there has been a steady progression in the jurisprudence of this state and others to tolerate ever more restrictive limitations on the length of closing argument.

Arguments of several hours were once common and considered a matter of right.[1] Today, limiting argument to ten or fifteen minutes per side is routinely approved by appellate courts.[2] In fact, the majority cite a number of decisions upholding restrictions imposed on argument similar to the one found here. The rule seems to be that if counsel is completely denied an opportunity to present argument, reversible error results from an undeniable infringement of the Sixth amendment.[3] However, if the trial court, in its discretion, simply limits the time permitted for argument, appellate courts generally approve the limitation. How far does this logic extend? Is a five minute limitation permissible under the Sixth Amendment? How about a one minute limitation? The trend toward ever shrinking time limits on closing argument cannot continue indefinitely without extinguishing any meaningful right to argue.[4] At some point, appel-

1. See *People v. Young*, 136 Cal.App. 699, 29 P.2d 440, 444 (1934) (upholding a limitation of 3 hours per side in an assault case); *People v. Phillips*, 120 Cal.App. 644, 8 P.2d 228, 233 (1932) (approving a restriction of 2½ hours in a murder case); *State v. Hoyt*, 47 Conn. 518, 531 (1880) (approving a 4 hour limitation in a homicide case); *Lindsay v. State*, 138 Ga. 818, 76 S.E. 369, 370 (1912) (affirming a 2½ hour limit in a murder case); *State v. Riddle*, 20 Kan. 711, 714 (1878) (upholding a time limitation of 4 ½ hours in a murder case); *Smith v. Commonwealth*, 100 Ky. 133, 37 S.W. 586, 587 (1896) (finding no abuse of discretion in limiting argument to 4 hours per side in a murder case); *Weaver v. State*, 24 Ohio St. 584, 585 (1874) (finding trial court did not abuse its discretion to limiting argument to 5 hours per side after a two day trial for attempted murder); *Bradley v. State*, 60 Tex. Crim. 398, 132 S.W. 484, 487 (App.1910) (affirming a 3 hour limit in a manslaughter trial); *State v. Shores*, 31 W.Va. 491, 7 S.E. 413, 418 (1888) (approving a 4 hour limitation in a burglary case).

2. See *Bowman v. State*, 331 So.2d 775, 776 (Ala.Crim.App.), *cert. denied*, 331 So.2d 777 (Ala.1976) (affirming a 15 minute limit in a drug case); *Dawes v. Commonwealth*, 349 S.W.2d 191, 193 (Ky.1961) (finding no abuse of discretion in limiting argument to 15 minutes in a possession of stolen property case);

*Decker v. State*, 734 S.W.2d 393, 395 (Tex. App.-Houston [1st Dist.] 1987, pet. ref'd) (holding limitation of 15 minutes proper in aggravated robbery trial); *Esterline v. State*, 707 S.W.2d 171, 176 (Tex.App.-Corpus Christi 1986, pet. ref'd) (approving limitation of 10 minutes per side in a delivery of marijuana case); *Moya v. State*, 691 S.W.2d 63, 66 (Tex. App.-San Antonio 1985, no pet.) (upholding a limitation of 10 minutes per side in a drug case).

3. *State v. Davis*, 822 So.2d 161, 165 (La.Ct. App.2002) (holding trial court erred in denying counsel an opportunity to present closing arguments in an armed robbery case); *State v. Moorcraft*, 319 So.2d 386, 391 (La.1975) (holding trial court erred in denying argument in a traffic violation case); *Yopps*, 178 A.2d at 882 (Md.1962) (holding trial court abused its discretion in a burglary case where it denied argument in a bench trial).

4. The tendency toward ever shrinking limitations on closing argument has been resisted in some states. For example, in *Foster v. State*, the court announced: "[W]ide latitude must be given counsel in arguing his case to the jury and ordinarily arguments restricted to thirty minutes or less are considered suspect." 464 So.2d 1214, 1215 (Fla.Dist.Ct. App.1985).

late courts must decide whether the Sixth Amendment is to be fully observed or not.

Everyone concedes that the accused must be permitted a full hearing where, if he chooses, he may present all relevant evidence in his defense. In this endeavor he is entitled to the assistance of counsel. Moreover, the right to be represented by counsel includes the right to fully argue the merits of his defense. How a lawyer chooses to argue may vary. Counsel may argue the case with great aplomb and skill, or he may deliver a mediocre presentation utterly lacking in logic and persuasive impact. Counsel may be a gifted orator, or he may be shy and awkward; he may speak loudly or softly; he may be animated, or he may be cold and stiff. Whatever method counsel adopts, the trial judge must sit silently, for the accused has placed his defense in the hands of his counsel, not the judge.

In several states, the erosion of a party's right to present argument has been halted by statute. The North Carolina legislature, for example, has mandated that closing argument to a jury may be limited "to not less than one hour on each side in misdemeanors and appeals from justices of the peace; to not less than two hours on each side in all other ... felonies less than capital; [and] in capital felonies, the time of argument of counsel may not be limited otherwise than by consent." N.C. Gen.Stat. § 7A–97 (1995).

The Supreme Court of Georgia has removed all discretion from trial judges to set time limits for closing argument in felony cases by interpreting Section 17–8–73 of the Georgia Code to be a legislative expression of the maximum and minimum time limits for argument in felony cases, *i.e.*, two hours for capital felonies and one hour for non-capital felonies. *See Chapman v. State*, 273 Ga. 865, 548 S.E.2d 278, 282 (2001) (holding a trial court has no discretion to impose any further limit on the time for closing argument than that provided by statute, and failure to afford the parties two hours for argument in a capital case, even if the death penalty was not sought, is error as a matter of law). *See also*

If, due to time limitations, counsel is constrained to leave off some point of fact, some logical syllogism, some emotional plea—has the defendant been afforded a full or partial hearing? If counsel must hurry his remarks and speak in an unnatural manner to meet the time restrictions, has not the judge dictated both the content of the argument and the manner of its delivery? In other words, has not the court infringed upon the defendant's right to be fully represented by counsel?[5] The right to counsel was "secured to the people of England, from whence we [borrowed it], by long and persistent efforts." *Dille v. State*, 34 Ohio St. 617, 619 (Ohio 1878). By what authority do courts infringe upon it today? The fact that we came into possession of this liberty as a conceded right, ought not to cause us to underate or forget its importance. *Id.* While the people have it within their authority to repeal the Sixth Amendment, the judiciary (even by incremental progression) do not.

*Monroe v. State*, 272 Ga. 201, 528 S.E.2d 504, 506 (2000) (holding that defendant in trial for malice murder entitled by statute to two hours for closing argument); *Massey v. State*, 270 Ga. 76, 508 S.E.2d 149, 151 (1998) (same).

Also, the Oregon Rules of Civil Procedure provide that "[n]ot more than two counsel shall address the jury on behalf of the plaintiff or defendant; the whole time occupied on behalf of either shall not be limited to less than two hours." ORCP 58 B(7). Moreover, this rule is made applicable to criminal cases by Section 136.330 of the Oregon Revised Statutes. *State v. Doern*, 156 Or.App. 566, 967 P.2d 1230, 1232 (1998, pet.denied) (holding trial court in a felony assault case erred in limiting argument to 20 minutes in violation of ORCP 58 B(7)).

5. This argument was eloquently made in 1893 by W.W. Hair before the Texas Court of Criminal Appeals in defense of a client who had been convicted of theft after the trial court restricted the time for argument to twenty minutes. *See Walker v. State*, 32 Tex.Crim. 175, 22 S.W. 685 (Tex.Crim.App. 1893).

Even before the advent of the Sixth Amendment, argument was a fundamental component of a fair trial. In the "16th and 17th centuries, when notions of compulsory process, confrontation, and counsel were [still] in their infancy, the essence of the English criminal trial was argument between the defendant and counsel for the Crown.[6] Whatever other procedural protections may have been lacking, there was no absence of debate on the factual and legal issues raised in a criminal case." *Herring v. New York*, 422 U.S. 853, 860, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

While procedural protections are much more extensive today, than in the 16th century, this fact does not diminish the importance of closing argument. The right to fully argue a case "is of inestimable value, not only to the accused, but to the administration of public justice." *Wingo v. State*, 62 Miss. 311, 1884 WL 3462, at *3 (Miss. Oct. 1884). For example, while jurors generally do a good job of determining the facts, studies abound "demonstrating the extent to which jurors misapprehend the relevant law."[7] "The problem is especially severe when the law is set forth in pattern instructions that—because they are designed without the facts of any particular case in mind—tend to be abstract, general, and technical." Christopher May, 18 Loy. L.A. L.Rev. at 872. "In one experiment, mock juries made numerous mistakes concerning the law—mistakes that were not corrected in the later deliberations. This failure to apply the law correctly was by no means a failure to take the law seriously. Discussions of the law took up one-fifth of the deliberation time

and were carried out with great intensity, frequently with an apparent sense of frustration." *Id.* "Every law professor knows this to be a serious problem for law students who, while they may have mastered the black-letter law, cannot apply it to a set of facts even after a semester or more of study. Students can usually grasp the facts and recite the law, but they are commonly unable to build a bridge between the two." *Id.*

"Also telling are studies showing that jurors frequently cannot answer simple true-false questions concerning statements of law taken from instructions they were given in court. Their understanding is often little better than that of persons who never heard the instructions at all." *Id.* A lawyer, however, can do what the trial judge is not permitted to do—explain the court's charge in simple, everyday language and apply it to specific evidence. Without the benefit of argument, juries are often hopelessly confused. On appeal, we presume the jury understood and followed the court's charge, but "often the judge must state those rules to the jury with such niceties that many lawyers do not comprehend them, and it is impossible that the jury can." *Skidmore v. Baltimore & O.R. Co.*, 167 F.2d 54, 64 (2d Cir.1948). In short, "juries have the disadvantage ... of being treated like children while the testimony is going on, but then being doused with a kettleful of law during the charge that would make a third-year law-student blanch." *Id.* (quoting Curtis Bok, I Too, Nicodemus 261–62 (1946)).

---

**6.** In fact, Lord Coke was of the opinion that no man, even "with all his true and uttermost labors," could hope to achieve a proper disposition in a difficult case "without solemn argument, where I am persuaded, Almighty God openeth and enlargeth the understanding of those desirous of justice and right." John

F. Dillon, The Laws and Jurisprudence of England and America 191 (1894).

**7.** Christopher N. May, *The Sound of the Gavel: Perspectives on Judicial Speech: "What Do We Do Now?": Helping Juries Apply the Instructions*, 28 Loy. L.A. L.Rev. 869, 872 (1995).

In addition to explaining the charge, counsel may draw reasonable conclusions from the evidence which the jury never considered. In fact, the "primary purpose of direct and cross examination of witnesses ... 'is to create the record upon which summation will be based.'" *State v. Washington*, 614 So.2d 711, 713 (La.1993) (quoting 6 A.P. ORDOVER, CRIMINAL LAW ADVOCACY, § 1.01 (1990)). Sometimes facts are developed so subtly and skillfully on cross-examination, the defense is not immediately obvious even to the prosecutor. *Id.* On these occasions the accused's defensive theory is not apparent *until* closing argument. Consider, for example, Abraham Lincoln's first defense of a client charged with murder. He engaged in no cross-examination of the prosecution's witnesses save for the state's sole eye-witness. Of this witness, Lincoln asked only fourteen questions, and these inquiries seemed to have no particular relevance to the case. Only thereafter did Lincoln show by irrefutable logic that the witness was none other than the murderer himself. The court ordered the witness arrested, and he promptly confessed. FRANCIS L. WELLMAN, THE ART OF CROSS-EXAMINATION 56–58 (1904).

"[T]here will be cases where closing argument may correct a premature misjudgment and avoid an otherwise erroneous verdict. And there is no certain way for a trial judge to identify accurately which cases these will be, until the judge has heard the closing summation of counsel." *Herring*, 422 U.S. at 863, 95 S.Ct. 2550. If counsel is not afforded the opportunity to fully argue the case, the brilliance of his cross-examination and the significance of critical testimony, carefully cultivated during trial, may never be revealed. Thus, when a trial judge imposes restrictive time limits, he always runs the danger of inadvertently depriving the defendant of the full (and sometimes the best) representation of counsel because he simply does not know what counsel is about to say. Accordingly, when "time for the argument ... is restricted by the court, it should be very clear that the right of the accused to be heard has not been essentially impaired, and that an opportunity for making full and complete defense on the whole case has not been denied." *Willie v. State*, 585 So.2d 660, 676 (Miss.1991), *overruled on other grounds by King v. State*, 784 So.2d 884, 889 (Miss.2001).

In addition to the power of cold logic, it is counsel's privilege to argue the case in the manner he deems best. Counsel may indulge in "flights of oratory." He may, in fact, make a naked appeal to the juror's emotions. If the Sixth Amendment is to have any application to modern trials, the speed, volume, timing, and strategy employed by counsel in his final argument must be determined by counsel, not the court. Counsel must not be constrained by court imposed restrictions to make "such a luke-warm and sterile argument that the jury is unable to determine which side of the case he is on." *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 684 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref. n.r.e.).

When Captain Thomas Preston and eight British soldiers under his command were tried for murder in 1770, they were defended by a future President of the United States, John Adams. The defendants were accused of the "bloody butchery" acclaimed at the time as the "Boston Massacre." In asserting his clients' claim of self-defense, Adams faced the daunting task of persuading an American jury to see the incident through the eyes of British soldiers occupying the city.

Adams' closing argument in the Preston case was hailed as a "virtuoso performance," and Preston was acquitted.

DAVID McCULLOUGH, JOHN ADAMS 65–68 (2001). Thereafter, Adams defended the eight enlisted men who fired into the crowd. His closing argument, *which lasted two days*, was described as "electrical." *Id.* Persuaded by Adams' logic and oratory, the jury acquitted six of the eight soldiers. Could Adams have achieved the same result in twenty minutes? If the difference between an acquittal and a conviction is determined by whether counsel is permitted to fully argue the case, how can we say the imposition of overly restrictive time limits does not infringe upon the Sixth Amendment?

"It is very difficult for a judge to determine what effect a given line of argument may have upon a jury, or some one of them, or what period may be necessary to enable counsel to present, in the aspect deemed by them important, the case of their client. The minds of men are so differently constituted that an advocate may require much more for the statement and elaboration of his view than another." *People v. Keenan,* 13 Cal. 581, 584 (1859).

Nevertheless, I recognize that if trial courts could not restrict the length of argument, some attorneys would be tempted to filibuster. In fact, "intolerable evils might result and the very purposes for which courts of justice were instituted might be defeated if no limitation could be imposed on the freedom of speech in this behalf." *Wingo,* 62 Miss. 311, 1884 WL 3462, at *4. Thus, the trial judge may "restrain what has been termed . . . an

'abuse' of [the right to argue]," which simply means "that counsel may be restricted to a discussion of matters relevant to the case, and restrained from wasting the time of the court by useless repetition." *People v. Green,* 99 Cal. 564, 34 P. 231, 232 (1893).

For example, if, during argument, a lawyer begins reading from a phone book, the trial court may cut him off because the "argument" has absolutely no relevance to the case or the issues to be determined by the jury. Likewise, if a lawyer, having completely exhausted his arguments, begins repeating himself, the court may impose restrictions to keep from wasting time. Apart from these two considerations, however, I cannot conceive of any other valid restraint upon closing argument. So while the trial court is vested with discretion in regulating the duration of argument, such discretion is not unlimited.[8]

Here, the record demonstrates appellant's counsel was engaged in a legitimate, purposeful, non-repetitive argument when he was abruptly silenced by the trial court. For what purpose was counsel cut short? Not to quell improper argument, nor silence useless repetition. The argument appears to have been limited solely for the convenience of the court. In fact, the majority contend the trial court has the prerogative of limiting argument in order to move the docket more expeditiously. This is not, in my opinion, a valid reason for limiting argument.[9]

8. *See,* for example, *Huntly v. State,* 34 S.W. 923, 924 (Tex.Crim.App.1896) (holding that time limit of 15 minutes per side for argument in case that took four hours to try was improper, but not reversible because counsel failed to make sufficient bill of exceptions); *Walker v. State,* 32 Tex.Crim. 175, 22 S.W. 685, 686 (Tex.Crim.App.1893) (holding trial judge erred in limiting argument to 45 minutes per side in a theft case supported largely by circumstantial evidence—noting that

"while time is precious to the court, it is infinitely more so to him for whom counsel is pleading, and whose life, liberty, and happiness is resting in the balances of Justice.").

9. *See State v. Kay,* 12 Ohio App.2d 38, 230 N.E.2d 652, 660–62 (1967) (holding trial judge erred in limiting argument in bribery case to 45 minutes when the judge stated he was limiting argument because (1) he wanted to get the case to the jury by 4 o'clock in the

Admittedly, trial courts are "under extreme pressures to move cases and keep their dockets current, but those admirable goals should not be accomplished at the expense of fairness to the litigants and without consideration for the jurors who could be greatly assisted in rendering their verdict by the attorneys' closing arguments." *Bell v. Harland Rayvals Transp., Ltd.,* 501 So.2d 1321, 1323 (Fla. Dist.Ct.App.1986). "While time is important to the court it is also important to the accused, whose life or liberty hangs in the balance." *Yopps,* 178 A.2d at 882. In other words, "the need for expedition can never justify a denial of a reasonable opportunity to present the defendant's case." *Comi v. State,* 202 Md. 472, 97 A.2d 129, 132 (1953). Thus, while the trial judge may, in his discretion, limit the length of argument, this "power ... is qualified by the competing right of the defendant, which has constitutional stature, to be heard either by himself or by counsel." 3 CHARLES E. TORCIA, WHARTON'S CRIMINAL PROCEDURE § 449 (13th ed.1991).

When deciding what time limitations should be imposed upon counsel, a trial court should consider not simply the press of time, but the length of the trial, the number of witnesses, the amount of evidence, the importance of the case, and the number and complexity of issues. *Bell,* 501 So.2d at 1323.

Here, appellant was tried for capital murder and, therefore, subject to the most severe penalty our law permits against a juvenile offender-confinement in the penitentiary for life. Considering the enormity of the crime, few cases could arguably be more important to society and the accused, than the one presented here.[10]

During the course of appellant's trial, which lasted two days, the jury heard testimony from eleven witnesses. One factor in deciding whether the trial court abused its discretion in limiting argument is to consider the number of witnesses called at trial versus the amount of time to analyze their testimony.[11] Here, if counsel had

afternoon, (2) he had another case scheduled for trial the next business day, and (3) he wanted to spare the jury the inconvenience of returning after the weekend).

**10.** For other murder cases in which the trial court abused its discretion in limiting the time for argument, *see Keenan,* 13 Cal. 581 (1859) (holding limitation of 3 hours was an abuse of discretion in a murder case); *Stockton v. State,* 544 So.2d 1006, 1009 (Fla.1989) (finding trial court erred in limiting argument to 30 minutes in a murder trial that lasted two days and in which 15 witnesses testified); *Neal v. State,* 451 So.2d 1058, 1059–60 (Fla. Dist.Ct.App.1984) (finding trial court abused its discretion in limiting argument to 25 minutes in a second-degree murder case); *Fugate v. Commonwealth,* 254 Ky. 663, 72 S.W.2d 47, 48 (1934) (finding 25 minutes was insufficient time to fully argue a murder case); *Willie v. State,* 585 So.2d 660, 676 (Miss.1991) (holding trial court erred in limiting punishment argument to 15 minutes in a capital murder trial); *State v. Tighe,* 27 Mont. 327, 71 P. 3, 9 (1903), *overruled on other grounds by State v.*

*Sherman,* 35 Mont. 512, 90 P. 981 (1907) (finding error to restrict argument to 1 hour and 45 minutes in a capital murder case); *Collier v. State,* 101 Nev. 473, 705 P.2d 1126, 1131–32 (1985) (holding a 1 hour argument in murder case insufficient because it permitted counsel less than 2 minutes per witness to review their testimony); *State v. Cash,* 138 S.C. 167, 136 S.E. 222 (1927) (holding that one hour was not sufficient time for argument in a murder case); *State v. St. Clair,* 3 Utah 2d 230, 282 P.2d 323, 331–32 (1955) (holding 40 minutes for argument in capital murder case was an abuse of discretion); *State v. Mayo,* 42 Wash. 540, 85 P. 251, 254 (1906) (holding a limitation of 1 hour and 30 minutes per side too restrictive in a capital murder case).

**11.** The trial court was held to have abused its discretion in limiting argument in the following cases in part, at least, because the testimony of the witnesses could not be adequately reviewed in the time allotted for argument: *Rossi v. United States,* 9 F.2d 362, 368 (8th

devoted his *entire* argument to simply analyzing the testimony of the witnesses, he would have had only 1 minute and 49 seconds to review, examine, and comment on the testimony of each witness. Again, this seems to be an unreasonable restriction.

In addition to reviewing the evidence, the record demonstrates that counsel attempted to explain the court's charge to the jury. The issues before the jury were both numerous and complex. In the limited time available to him, counsel hurriedly tried to set forth the three offenses for which appellant could be convicted. He then attempted, within the context of the court's charge, to show why there might be a reasonable doubt regarding proof of at least one of the elements of capital murder, *i.e.*, intent to rob. Counsel endeavored to explain the concept of conspiracy and the law of parties to the jury and to show why the evidence could not reasonably support a guilty verdict under either theory. In fact, the majority observe that appellant's counsel did address many of the topics articulated in his objection to the trial court's imposition of a twenty-minute time limit. However, the majority also recognizes that counsel addressed these points in a hurried and cursory fashion. A cursory argument mandated by overly restrictive time limitations does not satisfy the constitutional guarantee of full representation by counsel.

"The crucial question in reviewing the trial court's time limitations is whether [appellant's] counsel [was] permitted to advocate effectively for [his client]. One factor [to] consider in making this determination is whether the court's restrictions hamper the jury's ability to understand the information and issues at trial." *United States v. Gray,* 105 F.3d 956, 963 (5th Cir.), *cert. denied,* 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1057 (1997). "In all events, the time must be reasonable and should permit counsel an adequate opportunity to relate the factual argument to the governing principles of law." *Strong,* 495 So.2d at 1240. "Unless one takes the view that counsel's final argument should be nothing more than a bird's-eye surface review of the case" with no in-depth analysis of the evidence, "a rushed, scatter-gun presentation" with no real coherence cannot be fairly deemed as a legitimate opportunity to argue the case to the jury. *Maleh,* 491 So.2d at 292.

In attempting to comply with the trial court's time limits, counsel was frustrated by the length of the charge and the complexity of the legal issues. Counsel's request for additional time to explain and refute each of the nine possible factual scenarios that might authorize a guilty verdict was denied. Yet the record reflects it took the trial judge 21 minutes to read the 13 page charge to the jury, while counsel was afforded only 20 minutes for closing argument. Thus, appellant's counsel was somehow expected to explain, apply, and argue the charge in less time than that required to simply read the charge without the benefit of explanation, applica-

---

Cir.1925) (1 minute and 9 seconds per witness); *People v. Green,* 99 Cal. 564, 34 P. 231, 232 (1893) (2 minutes and 30 seconds per witness); *Munez v. State,* 643 So.2d 82, 83 (Fla. Dist. Ct.App.1994) (4 minutes per witness); *Knapp v. Shores,* 550 So.2d 1155, 1156 (Fla.Dist.Ct.App.1989) (1 minute and 45 seconds per witness); *Strong v. Mt. Dora Growers Co-op.,* 495 So.2d 1238, 1240 (Fla.Dist.Ct.App.1986) (1 minute and 32 seconds per witness); *Maleh v. Florida East Coast Prop., Inc.,* 491 So.2d 290, 292 (Fla.Dist.Ct.App.1986) (56 seconds per witness); *Woodham v. Roy,* 471 So.2d 132 (Fla.Dist.Ct.App.1985) (4 minutes per witness); *Washington,* 614 So.2d at 713 (1993) (2 minutes and 9 seconds per witness); *Huntly,* 34 S.W. at 923 (1 minute and 22 seconds per witness); *Jones v. Commonwealth,* 87 Va. 63, 12 S.E. 226, 228 (1890) (1 minute and 46 seconds per witness).

tion, or argument. Simple logic compels the conclusion that this was an impossible task.

Though I believe the trial court abused its discretion in limiting argument to twenty minutes, I am also of the opinion that a criminal conviction must not be reversed lightly. A criminal trial should be a decisive and portentous event, and if a defendant is guilty, he should look upon the courtroom with an apprehension and foreboding of judgment.

> A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens.

*Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). But while finality and justice are important considerations, the people of this nation, and of this state, have established constitutional guarantees for the accused that the judiciary are sworn to uphold, and if the court imposes an arbitrary limitation of time upon counsel, against his consent, this must be done at the risk of a new trial. *Green*, 34 P. at 233.

While the evidence presented by the State against appellant was substantial, I do not believe he was afforded a fair trial. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring*, 422 U.S. at 862, 95 S.Ct. 2550. "There is no judge, however able and learned, and no jury, however intelligent, but may be benefitted, and receive valuable assistance in reaching a correct conclusion, from the argument of counsel." *Walker*, 22 S.W. at 686. "[T]o limit the argument of counsel for the defense in a criminal prosecution is a matter of great delicacy, and should be done with the utmost prudence and caution." *Willie*, 585 So.2d at 676.

The issue presented here, as the majority recognizes, is a close one in which there may be legitimate differences of opinion. For the defense, however, closing argument is the last clear chance to persuade the jury that there may be reasonable doubt of the defendant's guilt. *Herring*, 422 U.S. at 862, 95 S.Ct. 2550. By severely limiting the time for argument, the trial court deprived appellant of the whole and full representation of counsel. Because I believe appellant's Sixth Amendment right to representation by counsel was infringed, and I have grave doubts that the limitation of argument did not affect the outcome of the trial, I cannot, in good conscience, affirm the conviction. Accordingly, I respectfully dissent.